NATIVIDAD VASQUEZ, PLAINTIFF-RESPONDENT, v. GLASSBORO SERVICE ASSOCIATION, INC., A NEW JERSEY CORPORATION; JOSEPH GAROFALO, INDIVIDUALLY, AND IN HIS CAPACITY AS MANAGER OF THE GLASSBORO SERVICE ASSOCIATION; JOHN L. CARUSO, INDIVIDUALLY, AND IN HIS CAPACITY OF ASSISTANT MANAGER OF THE GLASSBORO SERVICE ASSOCIATION, DEFENDANTS-APPELLANTS.
Argued September 11, 1979—Decided June 10, 1980.

*Frederick A. Jacob* argued the cause for appellants (*Lipman, Antonelli, Batt* and *Dunlap*, attorneys).

*Michael S. Berger,* Farm Workers Rights Project, Civil Liberties Education and Action Fund of American Civil Liberties Union of New Jersey, argued the cause for the respondent.

The opinion of the Court was delivered by

POLLOCK, J.

The primary issue is whether a farm labor service that employs migrant farmworkers from Puerto Rico and provides them with living quarters must dispossess a worker, not by self-help, but in a judicial proceeding after terminating his employment.

Natividad Vasquez, a Puerto Rican farmworker, instituted this action after he was dispossessed without notice following the termination of his employment by Glassboro Service Association, a farm labor service organization. Glassboro had employed Vasquez pursuant to a contract negotiated with the Puerto Rican Department of Labor. The Chancery Division ruled that Glassboro should not have dispossessed Vasquez by self-help, but in a summary dispossess proceeding. *Vasquez v. Glassboro Service Association,* 159 *N.J.Super.* 310 (1976). The Appellate Division affirmed. 159 *N.J.Super.* 218 (1978). We granted certification. 79 *N.J.* 478 (1979).

We hold that a farm labor service may not use self-help, but must proceed in a judicial action to dispossess a farmworker who remains in possession of his living quarters after termination of his employment. We reach that conclusion although we hold that a migrant farmworker is not a tenant or otherwise included within *N.J.S.A.* 2A:18–61.1(m) pertaining to the dispossession of certain residential tenants. We hold further that the failure of the Glassboro contract to provide a migrant farmworker with a reasonable opportunity to find shelter before dispossession is against the public policy of the State, and we imply into the contract a provision for a reasonable time to find alternative housing. In resolving a dispute between a farmworker and a labor service, a court may grant time to the worker to find housing, direct the labor service to assist him in obtaining

housing or provide him with return passage to Puerto Rico, or order other appropriate relief.

## I

Although our analysis is based on facts which occurred in 1976, there is no indication that the essential facts, including the contract, relationships of the parties, or working conditions have changed since that time. Glassboro is a non-profit corporation comprised of farmers who contracted with Glassboro for migrant farm labor. The farmers called Glassboro as they needed workers to pick crops, and Glassboro transported workers from its labor camp to the farms. The length of time that a worker stayed at a farm varied, depending primarily on the time needed to pick a crop. Glassboro paid the worker his wages, and the farmer paid Glassboro for those wages plus a commission for Glassboro's services.

Only men were hired; the workers' families remained in Puerto Rico. Glassboro paid a farmworker $2.40 per hour and charged him $23 per week for meals. The worker agreed to work eight hours a day for six days a week, plus overtime as mutually agreed.

The 1976 contract stated that a worker was to pay for his transportation from Puerto Rico. If he completed his contract, he would be reimbursed for the cost of transportation from and provided return transportation to Puerto Rico. If the worker did not fulfill his contract, Glassboro was not obliged to reimburse him for the cost of transportation. Although the contract provided that Glassboro would furnish a non-negotiable airplane ticket to Puerto Rico for a worker who became physically unfit, there was no comparable provision for a worker who was fired. The contract period was for 28 weeks, or until December 1, whichever came first.

The contract provided that, if an employee was to be discharged, a hearing was to occur no later than five days after the employee was given notice of termination. The contract did not

require a minimum amount of time to elapse between notice and termination of employment.

The contract provided further for administrative review within the Puerto Rican Department of Labor whenever a worker had a complaint "regarding the breach, application, interpretation or compliance" with the contract. If the Secretary of Labor determined that Glassboro had "not adequately remedied the complaint", the Secretary could represent the worker and sue Glassboro.

Pursuant to the contract, Glassboro supplied living quarters for workers at its labor camp in New Jersey. Those quarters consisted of barracks housing up to 30 men. Each worker received a mattress, bedding, and a locker. The barracks were equipped with common toilets, showers, and lavatories. Although some farmers charged the workers for housing while the workers were at the farms, Glassboro did not impose any extra charge for housing at its labor camp. The contract did not require a migrant farmworker to live at Glassboro's labor camp. Nonetheless, the parties contemplated that the farmworker would reside at the labor camp.

In 1976, Vasquez was recruited in Puerto Rico and came to New Jersey to work for Glassboro. According to Glassboro's foreman, Vasquez's work was not satisfactory. On July 19, 1976, the foreman told Vasquez that he was to be discharged. A few hours later Vasquez had his "hearing" with the foreman and a field representative of the Puerto Rican Department of Labor. Thereafter the foreman decided to complete the discharge, a decision Vasquez does not challenge in this action. Although there were vacant spaces at the Glassboro barracks, Vasquez was not permitted to remain overnight. The foreman told him to gather his belongings and leave.

Unable to speak English and without funds to return to Puerto Rico, Vasquez sought the assistance of the Farmworkers Corporation, a federally funded non-profit corporation dedicated to the needs of farmworkers. He also consulted with the

Farmworkers Rights Project of the Civil Liberties Education and Action Fund of the American Civil Liberties Union of New Jersey. A Rutgers law student returned with Vasquez to the camp and requested that Vasquez be allowed to remain overnight. The request was refused. Vasquez stayed with a friend who was participating in a job training program conducted by the Farmworkers Corporation.

The Farmworkers Rights Project filed a complaint on July 22, 1976, seeking an order permitting Vasquez to reenter his living quarters and enjoining defendants from depriving him of the use of the quarters except through judicial process. The complaint also sought damages, but Vasquez has abandoned that demand.

The trial court interpreted a provision of *N.J.S.A.* 2A:18–61.1 to apply to Vasquez. *N.J.S.A.* 2A:18–61.1 provides that a landlord may not remove a tenant except by establishing one of enumerated grounds as good cause. *N.J.S.A.* 2A:18–61.1(m) states good cause exists if "[T]he landlord or owner conditioned the tenancy upon and in consideration for the tenant's employment by the landlord or owner as superintendent, janitor or in some other capacity and such employment is being terminated." The court found Vasquez to be included within the phrase "in some other capacity", *Vasquez, supra,* 159 *N.J.Super.* at 313, 387 *A.*2d 1245, and ruled that Glassboro reinstate Vasquez to his living quarters.

Although Vasquez has since found housing, other workers have been evicted, one at 3:00 a. m. Shelter for dispossessed migrant farmworkers remains scarce. The Farmworkers Corporation estimates it provides emergency housing for approximately 500 workers each season.

Under the contract, once a worker's employment was ended, he had no right to stay at the camp. Glassboro had no obligation to arrange for alternative shelter. As with Vasquez, within the same day, Glassboro could notify a worker of the termination of his employment, meet with a representative of the

Puerto Rican Department of Labor, complete the termination of the employment, and dispossess the employee.

 The parties have urged that the dispossession of migrant farmworkers is likely to recur and have requested that we not treat the case as moot. We agree that the public interest requires that we resolve whether a migrant farmworker should be dispossessed from his living quarters through a judicial proceeding. *See Dunellen Bd. of Ed. v. Dunellen Ed. Ass'n,* 64 *N.J.* 17, 22 (1973); *Busik v. Levine,* 63 *N.J.* 351, 364 (1973), app. dism. 414 *U.S.* 1106, 94 *S.Ct.* 831, 38 *L.Ed.2d* 733 (1973).

## II

At common law, one who occupied premises as an employee of the owner and received the use of the premises as part compensation for his services or under a contract of employment was not considered a tenant. *See Scottish Rite Co. v. Salkowitz,* 119 *N.J.L.* 558 (E. & A. 1938) (caretaker who received monthly salary and use of premises was not a tenant but an employee who became a trespasser when his employment ended); *Gray v. Reynolds,* 67 *N.J.L.* 169 (Sup.Ct.1901) (agreement for one year between owner and sharecropper does not create landlord-tenant relationship); *McQuade v. Emmons,* 38 *N.J.L.* 397 (Sup.Ct.1876) (employee who received $25 per month and use of tenant house is a trespasser after end of employment); *Schuman v. Zurawell,* 24 *N.J.Misc.* 180 (Cir.Ct.1946) (apartment superintendent is not a tenant). *But see Morris Canal and Banking Company v. Mitchell,* 31 *N.J.L.* 99 (Sup.Ct.1864) (lock tender who used dwelling house as part compensation summarily dispossessed as a tenant).

The statute that the trial court found to be dispositive, *N.J.S.A.* 2A:18–61.1(m), modifies the common law rule by declaring an employee whose housing is conditioned upon employment to be a tenant. Consequently, an employee covered by the statute is entitled to three days' notice prior to institution of an eviction action. *N.J.S.A.* 2A:18–61.2(a). If *N.J.S.A.* 2A:18–61.-

1(m) applied to Vasquez, he would have been entitled to three days' notice after termination of his employment and before commencement of an eviction action.

█ The initial question is whether the Legislature intended to include migrant farmworkers in the phrase "in some other capacity" in *N.J.S.A.* 2A:18–61.1(m). Neither the words of the statute nor the legislative history indicates that the Legislature contemplated including farmworkers within that phrase. Consequently, the meaning of the phrase may be gleaned by applying principles of statutory construction. Where general words follow a specific enumeration, the principle of *ejusdem generis* requires that the general words are applicable only to the same class of things already mentioned. *Transcontinental Gas Pipeline Corp. v. Dept. of Conserv.*, 43 *N.J.* 135, 146 (1964). In *N.J.S.A.* 2A:18–61.1(m), the general words "in some other capacity" follow the specific enumeration of "superintendent" and "janitor". We determine that, within the meaning of the statute, a farmworker does not belong to the same class of employees as a janitor or superintendent. A farmworker who possesses a mattress and locker in an unpartitioned barracks while waiting to be sent to work on a farm is different from a superintendent or janitor residing with his or her family in an apartment house. The farmworkers are all men who come from Puerto Rico without their families. They live in large barracks with no privacy, sleeping in bunks in an unpartitioned room and sharing toilets and showers. Their occupancy of the barracks is intermittent, since it is a base camp for use while they are awaiting assignment to farms.

Courts in other jurisdictions have considered whether a migrant farmworker is a tenant for the purpose of determining if a right of access should be provided to third parties to visit the migrant farmworker. In *Washington v. Fox*, 82 *Wash.*2d 289, 510 *P.*2d 230 (Sup.Ct.1973), *cert.* den. 414 *U.S.* 1130, 94 *S.Ct.* 868, 38 *L.Ed.*2d 754 (1974), the court noted that, since the workers paid for the right to live in a labor camp, they were tenants.

Accordingly, the court held that an attorney and labor union organizer had the right to visit the farmworker. In *Folgueras v. Hassle*, 331 *F.Supp.* 615 (W.D.Mich.1971), the court concluded that the farmworkers were tenants even though they did not pay rent. The court noted that the free rent was "one justification for the low wage paid migrant laborers." *Id.* at 624. The workers and their families had exclusive possession of bungalows in the work camp. The court found that the workers had the right to receive visitors such as student coordinators providing social services and doing research.

Migrant farmworkers were described as tenants *sui generis* who had a right of access to information from service organizations and a right to receive visitors in *Franceschina v. Morgan*, 346 *F.Supp.* 833 (S.D.Ind.1972). In reaching its conclusion, the court stated that it did not matter whether the workers were characterized as tenants or employees. The offer of free rent did not prevent a finding that the workers were entitled to a right of access. The court found that the migrant worker, in effect, paid for the housing because he "swells the pool of agricultural labor in the area, which is to the company's advantage in that it tends to guarantee the flow of crops to its canneries. This is consideration enough, it seems to the Court, to denote the migrant a tenant for the term of the crop season." *Id.* at 838.

These cases from other jurisdictions holding farmworkers to be tenants are distinguishable. They have described farmworkers as tenants in reaching the conclusion that the farmworkers have a right to information and services from third parties. This Court has already ruled, without characterizing migrant farmworkers as tenants, that they are entitled to receive visitors, members of the press, and persons providing charitable and governmental services. *State v. Shack*, 58 *N.J.* 297, 307 (1971). The Court expressly reserved the question before us: "We of course are not concerned here with the right of a migrant

[farm]worker to remain on the employer's property after the employment is ended." *Ibid.* That issue is before us because Vasquez asserts he is a tenant within *N.J.S.A.* 2A:18–61.1(m). The import of that assertion is that a farm labor service could dispossess a farmworker only after giving notice as required by *N.J.S.A.* 2A:18–61.2 and by recourse to a judicial proceeding in either the superior court or the county district court. *N.J.S.A.* 2A:18–61.1. *See R.* 6:2–1, *R.* 6:3–4, *R.* 6:5–2.

Our analysis of the words of the statute, the absence of any illuminating legislative history, and the application of principles of statutory construction lead to the conclusion that a migrant farmworker is not a tenant within the meaning of *N.J.S.A.* 2A:18–61.1(m). The special characteristics of migrant workers' housing, the absence of a contractual provision for the payment of rent, the lack of privacy, the intermittent occupancy, and the interdependence of employment and housing support this conclusion. Accordingly, we modify the judgment of the Appellate Division insofar as it holds that a migrant farmworker is a tenant within the meaning of the summary dispossess statute. However, our conclusion that Vasquez was not a tenant does not end our inquiry or preclude a finding that a farm labor service may dispossess a migrant farmworker only by judicial process.

### III

In ascertaining whether a farmworker is entitled to notice before dispossession, we turn next to the Glassboro contract. As stated above, the contract resulted from negotiations between the Puerto Rican Department of Labor and Glassboro. No migrant farmworker participated directly or through a labor union in the negotiations. The record does not demonstrate whether or not the Puerto Rican Department of Labor has the same interests as the migrant farmworkers. The Puerto Rican Department of Labor may have been concerned also about reducing unemployment in Puerto Rico by finding jobs for its residents on farms in New Jersey. Whatever the interests of

the parties to the negotiations, a migrant farmworker was required to accept the contract as presented by Glassboro.

The contract in evidence is written in English. Although Vasquez spoke Spanish only, the record does not show that he received a Spanish translation of the contract. Nonetheless, he signed a copy of the contract.

Once a migrant farmworker came to Glassboro's labor camp in New Jersey, he depended on Glassboro for employment, transportation, food, and housing. He was separated by over 1300 miles from his home and family. Although an American citizen, he was isolated from most citizens in New Jersey by his inability to speak English. An invisible barrier separated a migrant farmworker from the rest of the State as he was shuttled from the labor camp to the farms. The lack of alternative housing emphasized the inequality between Glassboro and the migrant farmworkers. Once his employment ended, a farmworker lost not only his job but his shelter. The fear of discharge, and with it the loss of income, housing, and return passage to Puerto Rico permeated the contractual relationship. This is the setting in which we measure the contract against the public policy of the State.

■ Public policy eludes precise definition and may have diverse meanings in different contexts. *Henningsen v. Bloomfield Motors, Inc.*, 32 *N.J.* 358, 403 (1960). The sources of public policy include federal and state legislation and judicial decisions. *Allen v. Commercial Casualty Insurance Co.*, 131 *N.J.L.* 475, 478 (E. & A. 1944).

■ In the past, courts in New Jersey have refused to enforce contracts that violate the public policy of the State. *Houston Petroleum Co. v. Automotive Products Credit Ass'n*, 9 *N.J.* 122, 130 (1952). No contract can be sustained if it is inconsistent with the public interest or detrimental to the common good. *Driscoll v. Burlington-Bristol Bridge Co.*, 10 *N.J.Super.* 545, 575 (Ch.Div.1950), mod. 8 *N.J.* 433 (1952), *cert.* den. 344 *U.S.* 838, 73

*S.Ct.* 25, 97 *L.Ed.* 652 (1952). Contracts have been declared invalid because they violate statutes, promote crime, interfere with the administration of justice, encourage divorce, violate public morality, or restrain trade. *See, e. g., Staedler v. Staedler,* 6 *N.J.* 380, 389 (1951) (contract to bring suit for divorce or to make no defense to such suit is illegal and void); *see generally* 6A *Corbin, Contracts* (1962) §§ 1373–1378 at 1–27; 14 *Williston, Contracts* (3 ed. Jaeger 1972), §§ 1628–1629 at 2–11; 17 *Am.Jur.2d, Contracts,* § 155 *et seq.* With respect to employment contracts that have an otherwise lawful purpose, courts have afforded judicial sanction to post-employment restrictive covenants only to the extent that the covenants are reasonable and comport with public policy. *See, e. g., Karlin v. Weinberg,* 77 *N.J.* 408 (1978) (restrictive employment covenants between physicians enforceable only to the extent they are reasonable); *Whitmyer Bros., Inc. v. Doyle,* 58 *N.J.* 25 (1971) (postemployment agreement found reasonable); *Solari Industries, Inc. v. Malady,* 55 *N.J.* 571 (1970) (noncompetitive agreements are enforceable to the extent they are reasonable under the circumstances and not injurious to the public).

The courts and Legislature of New Jersey have demonstrated a progressive attitude in providing legal protection for migrant farmworkers. *See, e. g.,* Staff of Senate Subcomm. on Migratory Labor, Comm. on Labor and Public Welfare, 92d Cong., 2d Sess., *Federal and State Statutes Relating to Farmworkers* (Comm. Print 1972). In 1945 the State Legislature passed the Migrant Labor Act which, among other things, regulated housing and imposed sanitation standards for the benefit of migrant workers. *L.*1945, *c.* 71. That act was amended and the regulation of housing was extended in the Seasonal Farm Labor Act. *L.*1967, *c.* 91.

In 1971, the Legislature took further action to protect the rights of migrant farmworkers. Growers are required to provide drinking water and toilet facilities. *N.J.S.A.* 34:9A–1 *et seq.,* 37 to 41. The laws require that Spanish interpreters and

other personnel be available to assist seasonal workers in matters involving communications with any governmental agency. *N.J.S.A.* 34:9A–7.2. The Legislature also provided for the inspection by state officials of labor camps. However, those provisions may have been preempted by OSHA. Occupational Safety and Health Act of 1970, § 2 *et seq.*, 29 *U.S.C.A.* § 651 *et seq. See Harrington v. Department of Labor and Industry,* 163 *N.J.Super.* 595 (Law Div.1978). Enforcement of those statutes "resulted in a marked improvement in living conditions for migrant workers in New Jersey." Office of Agricultural Worker Compliance, New Jersey Department of Labor and Industry, *Status Report* 1 (1978).

In 1979, the federal government, pursuant to OSHA, assumed responsibility for inspection of many migrant labor camps. However, certain labor camps are still being inspected by New Jersey's Office of Agricultural Worker Compliance for the Federal Employment Service in order to comply with the federal requirement that housing be inspected prior to clearing any orders for interstate recruitment of migrant workers. *See* Wagner-Peyser National Employment System Act, § 1 *et seq.*, 29 *U.S.C.A.* § 49 *et seq.* The constant attention accorded by Congress and the State Legislature demonstrates a legislative concern for the well-being of migrant farmworkers.

In *Shack, supra,* 58 *N.J.* 297, this Court reversed convictions for trespass of a fieldworker and an attorney for organizations providing services for migrant farmworkers. Declining to characterize the migrant farmworker as either tenant or employee, Chief Justice Weintraub wrote:

> We see no profit in trying to decide upon a conventional category and then forcing the present subject into it. That approach would be artificial and distorting. The quest is for a fair adjustment of the competing needs of the parties, in the light of the realities of the relationship between the migrant worker and the operator of the housing facility. [*Shack, supra,* 58 *N.J.* at 307]

The Court weighed the property rights of the farmer against the rights of the farmworkers to information and services and found that the balance tipped in favor of the farmworker. Underlying that conclusion was recognition of the fundamental right of the farmworker to live with dignity. *Id.* at 308. As in *Shack*, the appropriate result in this case arises from the status and the relationship of the parties.

Later cases have manifested a continuing concern for the plight of the migrant farmworker. In *Freedman v. New Jersey State Police*, 135 *N.J.Super.* 297 (Law Div.1975), the right of access of the press to migrant camps was extended to include a college newspaper reporter and photographer. *See Harrington v. Department of Labor and Industry*, 163 *N.J.Super.* 595 (Law Div.1978) (New Jersey's Drinking Water and Toilet Facilities Act held enforceable); *Five Migrant Farmworkers v. Hoffman*, 136 *N.J.Super.* 242 (Law Div.1975) (OSHA preempts Seasonal Farm Labor Act for purpose of preoccupancy inspection, except for workers covered by Wagner-Peyser Act).

The enlightened approach of the courts and the Legislature provides the context in which we assess the Glassboro contract and consider how a migrant farmworker should be dispossessed from his living quarters at a labor camp.

■ A basic tenet of the law of contracts is that courts should enforce contracts as made by the parties. However, application of that principle assumes that the parties are in positions of relative equality and that their consent is freely given. *See Henningsen v. Bloomfield Motors, Inc.*, 32 *N.J.* 358, 386 (1960). In recent years, courts have become increasingly sensitive to overreaching in contracts where there is an inequality in the status of the parties. In *Shell Oil Co. v. Marinello*, 63 *N.J.* 402 (1973), this Court found that Shell was the dominant party and could dictate its own terms. *Id.* at 408. Accordingly, the Court "read into" a lease and franchise agreement between a major oil company and one of its dealers a restriction against unilateral

termination by the oil company absent good cause. *Id.* at 410. The Court reached that decision from a consideration of the instruments, the relationship between the parties, and the public policy of the State affecting that relationship. *Id.* at 406.

In a variety of other situations, courts have revised contracts where there was an inequality in the bargaining power of the parties. *See, e. g., Ellsworth Dobbs, Inc. v. Johnson,* 50 *N.J.* 528, 555 (1967) (owner of real estate not liable for commission to broker where sale was not consummated due to default of purchaser because of "substantial inequality of bargaining power" between owner and broker); *Allen v. Metropolitan Life Ins. Co.,* 44 *N.J.* 294, 305 (1965) (insurer and insured "not equally situated" and life insurance binder construed against insurer to permit recovery on life insurance policy); *Henningsen, supra,* 32 *N.J.* at 404 ("the grossly disproportionate bargaining power" between an automobile manufacturer and a buyer led to the invalidation of a disclaimer by the manufacturer of an implied warranty of merchantability in the sale of an automobile); *Grossman Furniture Co. v. Pierre,* 119 *N.J.Super.* 411 (Cty.Ct. 1972) (grossly unequal bargaining position of a welfare mother who signed an installment contract to purchase furniture and a refrigerator provided ground to reform the contract to exclude a recapture clause).

The principle has been applied also to leases. In *Kuzmiak v. Brookchester,* 33 *N.J.Super.* 575 (App.Div.1955), the court invalidated a clause in an apartment lease exculpating a landlord from liability for negligence. The court took judicial notice that the housing shortage resulted in "unequal bargaining power between apartment house owners and tenants . . . ." *Id.* at 587. This Court took cognizance of the housing shortage and the inequality in bargaining power of landlords and tenants in *Marini v. Ireland,* 56 *N.J.* 130 (1970). In *Marini,* this Court implied a covenant of habitability into a lease to permit a tenant to deduct the cost of repairing a toilet from rent due a landlord. More recently the inequality in bargaining power between land-

lord and tenant led this Court to comment that "lease agreements are frequently form contracts of adhesion . . . ." *Trentacost v. Brussel*, 82 *N.J.* 214, 226 (1980). In *Trentacost* the Court concluded that the implied covenant of habitability obliged a landlord to furnish reasonable safeguards, such as a lock on the front door of an apartment building, to protect tenants from foreseeable criminal activity on the premises. *Id.* at 228.

A migrant farmworker has even less bargaining power than a residential tenant. Although the contract did not require a migrant farmworker to live at the labor camp, the realities of his employment forced him to stay at the camp. Residence at the labor camp benefited not only the farmworker, but also Glassboro and its member farmers. It was more convenient for them if the workers resided at the camp: the pool of labor was at hand, and the workers could be transported conveniently to the farms. The contract assured Glassboro that there would be a labor source available on its property.

Under the contract, once a worker's employment was ended, he had no right to stay at the camp. Glassboro's possible need for the bed of a discharged farmworker, particularly during the growing season, is relevant, but not persuasive. In this case, Glassboro had ample space for Vasquez, yet he was turned out of the barracks on the same day he was fired. The interest of neither the migrant farmworker nor the public is served by casting the worker adrift to fend for himself without reasonable time to find shelter.

The status of a worker seeking employment with Glassboro is analogous to that of a consumer who must accept a standardized form contract to purchase needed goods and services. Neither farmworkers nor consumers negotiate the terms of their contracts; both must accept the contracts as presented to them. In both instances, the contracts affect many people as well as the public interest.

■ With respect to a standardized form contract, the intention of the consumer has been described as "but a subjection more or less voluntary to terms dictated by the stronger party, terms whose consequences are often understood only in a vague way, if at all." Kessler, *Contracts of Adhesion-Some Thoughts About Freedom of Contract*, 43 *Colum.L.Rev.* 629, 632 (1943). After noting the "gross inequality of bargaining position" between the parties in *Henningsen, supra*, 32 *N.J.* at 391, this Court stated that no meaningful consent had been given by the consumer to the terms of the contract. A contract where one party, as here, must accept or reject the contract does not result from the consent of that party. *Id.* at 390. It is a contract of adhesion:

> There being no private consent to support a contract of adhesion, its legitimacy rests entirely on its compliance with standards in the public interest. The individual who is subject to the obligations imposed by a standard form thus gains the assurance that the rules to which he is subject have received his consent either directly or through their conforming to higher public laws and standards made and enforced by the public institutions that legitimately govern him. [Slawson, *Standard Form Contracts and Democratic Control of Lawmaking Power*, 84 *Harv.L.Rev.* 529, 566 (1971)]

The absence of a provision in the contract for reasonable time to find housing after termination of his employment bespeaks Glassboro's superior bargaining position. Further, by failing to provide for a reasonable time to find alternative housing, the contract is inconsistent with the enlightened attitude of the Legislature and the courts towards migrant farmworkers.

■ The crux of this case thus becomes the unconscionability of the contract as it is sought to be enforced against the migrant workers. The unconscionability of the contract inheres not only in its failure to provide a worker with a reasonable opportunity to find alternative housing, but in its disregard for his welfare after termination of his employment. The inherent inequity of the contract arouses a sense of injustice and invokes the equita-

ble powers of the courts. In the absence of any concern demonstrated for the worker in the contract, public policy requires the implication of a provision for a reasonable time to find alternative housing.

## IV

At common law, on termination of employment, an employer could dispossess an employee who occupied premises incidental to his employment. *McQuade v. Emmons*, 38 *N.J.L.*, 397, 400 (Sup.Ct.1876). Similarly, a landlord could dispossess peaceably a holdover tenant. *Mershon v. Williams*, 62 *N.J.L.* 779, 784 (E. & A. 1899); *Todd v. Jackson*, 26 *N.J.L.* 525, 530–532 (E. & A. 1857). To that extent, both an employer and landlord could use self-help to regain possession peaceably. The advantage to them was that they were assured of prompt restoration of the use of their property. However, an inherent vice in self-help is that it can lead to confrontations and breaches of the peace. *See Thiel v. Bull's Ferry Land Co.*, 58 *N.J.L.* 212 (Sup.Ct.1895).

In the absence of self-help, a landlord or employer at common law was remitted to an action in ejectment. The problem with ejectment is that it was slow and expensive. VI-A *American Law of Property*, § 28.21 at 61 (1954). In New Jersey, ejectment has been replaced with a statutory action, *N.J.S.A.* 2A:35–1; however, that action is not a summary proceeding. *Shuster v. Bd. of Education of Hardwick Tp.*, 8 *N.J.Super.* 415 (Ch.Div. 1950), aff'd 17 *N.J.Super.* 357 (App.Div.1952).

With regard to real property occupied solely as a residence, the Legislature has resolved the dilemma by prohibiting entry without consent and by providing a summary dispossess proceeding. *N.J.S.A.* 2A:39–1 and *N.J.S.A.* 2A:18–53 *et seq.* Similarly, the Legislature has provided a summary dispossess proceeding for the removal of residential tenants. *N.J.S.A.* 2A:18–61.2. As explained above, migrant farmworkers are not tenants, and

there is no comparable statute providing for their summary dispossession on termination of their employment. In fashioning a suitable remedy, we acknowledge that the realities of the relationship between the migrant worker and a farm labor service are unique and summon a judicial response unrestricted by conventional categories, such as employer-employee and landlord-tenant. *See Shack, supra*, 58 *N.J.* at 307. We cannot confine ourselves to traditional actions for possession such as ejectment or summary dispossession.

After oral argument, we requested the parties to submit supplemental briefs analyzing the applicability of the unlawful detainer statute to a farmworker who remains peaceably in possession of his living quarters following termination of his employment. That question had not been presented previously for consideration by the trial court, Appellate Division, or this Court. One type of unlawful detainer statute, *N.J.S.A.*, 2A:39–4, pertains to holdover tenants. Another unlawful detainer statute pertains to persons taking possession "without the consent of the owner or without color of title . . . ." *N.J.S.A.* 2A:39–5. Although a migrant farmworker would qualify under the latter alternative as one who enters without color of title, the question remains whether he has "possession".

At common law, an employee who occupied his employer's premises had no possession of his own, but only the possession of his employer. *Schwinn v. Perkins*, 79 *N.J.L.* 515, 518 (E. & A. 1910); *McQuade v. Emmons*, 38 *N.J.L.* 397, 399 (Sup.Ct.1876); *see generally* Annotation, "Statute prescribing damages for forcibly ejecting or excluding one from possession of real property as applying to possession held by one as servant or employee", 14 *A.L.R.* 808 (1921). Consequently, on termination of his employment, the employee was considered a trespasser. *McQuade, supra*, 38 *N.J.L.* at 402.

The meaning of "possession" varies with the context of its use. Comment, *Defects in the Current Forcible Entry and*

*Detainer Laws of the United States and England*, 25 *U.C.L.A.L. Rev.* 1067, 1084 (1978). One writer suggests that "possession can only be usefully defined with reference to the purpose in hand; and that possession may have one meaning in one connection and another meaning in another." Shartel, *Meanings of Possession*, 16 *Minn.L.Rev.* 611, 612 (1932). Although there are no cases discussing possession under *N.J.S.A.* 2A:39–5, in *Poroznoff v. Alberti*, 161 *N.J.Super.*, 414 (Cty.D.Ct.1978), aff'd 168 *N.J.Super.* 140 (App.Div.1979), the trial court concluded that a week-to-week resident at a YMCA did not have possession under a related statute pertaining to forcible entry and detainer. Generally, a worker remains at Glassboro's camp only while waiting for assignment to a farm. Together with approximately 30 other men, he shared unpartitioned space in the barracks. We conclude that a migrant farmworker does not have possession of his living quarters within the meaning of *N.J.S.A.* 2A:39–5 and that the remedy of unlawful detainer is not available.

Even if the unlawful detainer act applied, it provides an imperfect solution to the conflicts between migrant workers and their employers. In an unlawful detainer action, a migrant farmworker could raise equitable defenses relevant to the right of possession, but not to collateral issues. *Vella v. Hudgins*, 20 *Cal.*3d 251, 254, 572 *P.*2d 28, 30, 142 *Cal.Rptr.* 414, 416 (Sup.Ct. 1977); *Heiser v. Rodway*, 247 *N.W.*2d 65, 67 (S.D.Sup.Ct.1976).

█ A migrant worker should be allowed to raise equitable claims or defenses even though they might be considered collateral to the issue of possession. That result is consistent with our conclusion that a tenant may assert equitable as well as legal defenses in a dispossess action. *See Marini v. Ireland*, 56 *N.J.* 130, 140 (1970). It is consistent also with the incorporation by the legislature of equitable considerations into the summary dispossess act by providing in *N.J.S.A.* 2A:18–55 that proceedings to dispossess a tenant for nonpayment of rent shall stop on payment of the rent. *See Vineland Shopping Center, Inc. v.*

*DeMarco*, 35 *N.J.* 459, 469 (1961). Even after granting a judgment of possession against a tenant, a judge has the statutory authority to stay the issuance of a warrant for removal or a writ of possession. *N.J.S.A.* 2A:42–10.6. He may delay eviction for a period no longer than six months "if it shall appear that by the issuance of the warrant or writ the tenant will suffer hardship because of the unavailability of other dwelling accommodations . . . ."

In the absence of a contractual provision or legislation addressing the plight of a migrant farmworker on termination of his employment, the courts, exercising equitable jurisdiction, should devise a remedy to fit the circumstances of each case. *See Sears, Roebuck & Co. v. Camp*, 124 *N.J.Eq.* 403, 411 (E. & A. 1938); *American Assoc. of Univ. Profs. v. Bloomfield College*, 129 *N.J.Super.* 249, 274 (Ch.Div.1974), aff'd 136 *N.J.Super.* 442, 448 (App.Div.1975). Depending on the circumstances, an equitable adjustment of the rights of the parties may vary from one case to another. *See, e. g., Cooper v. Nutley Sun Printing Co.*, 36 *N.J.* 189, 198 (1961); *Westinghouse Electric Corp. v. United Electrical, Radio and Machine Workers Local No. 410*, 139 *N.J.Eq.* 97, 108 (E. & A. 1946). An appropriate remedy might include time in addition to that implied in the contract, assistance in obtaining alternative housing, return passage to Puerto Rico, or some other form of relief. By abolishing self-help and requiring dispossession through a judicial proceeding, we provide a forum for an equitable resolution of a controversy between a farm labor service and a migrant farmworker on termination of the latter's employment.

We are mindful of the special considerations pertaining to migrant farmworkers and of the need for a prompt resolution of disputes between farmworkers and a farm labor service. In general, a summary action under *R.* 4:67 should be a more appropriate proceeding than a plenary action. In fact, the present case was instituted on complaint and order to show cause returnable three days later, at which time the court heard

testimony, reserved decision, and rendered a written opinion seven days later. We conclude that a dispute concerning the dispossession of a migrant farmworker on termination of his employment, whether instituted by a farm labor service or, as here, by a farmworker, should proceed in a summary manner under *R.* 4:67.

We affirm the judgment of the Appellate Division as modified and remand the matter to the trial court for the entry of an order consistent with this opinion.

*For affirmance*—Chief Justice WILENTZ and Justices SULLIVAN, PASHMAN, CLIFFORD, SCHREIBER, HANDLER and POLLOCK—7.

*For reversal*—None.