274 N.J. Super. 159 (1994)
643 A.2d 642
DAVIDSON BROS., INC., A NEW JERSEY CORPORATION, PLAINTIFF-APPELLANT,
v.
D. KATZ & SONS, INC., A NEW JERSEY CORPORATION; CITY OF NEW BRUNSWICK, A MUNICIPAL CORPORATION; C-TOWN, A DIVISION OF KRASDALE FOODS, INC., AND NEW BRUNSWICK HOUSING AUTHORITY, A BODY CORPORATE AND POLITIC, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued February 24, 1994.
Decided June 23, 1994.
*160 Before Judges GAULKIN, D'ANNUNZIO and WALLACE.
Sheppard A. Guryan argued the cause for appellant (Lasser, Hochman, Marcus, Guryan and Kuskin, attorneys; Mr. Guryan, of counsel; Bruce H. Snyder, on the briefs).
Philip Allan Borow argued the cause for respondent D. Katz & Sons, Inc. (Robert M. Adochio, attorney; Mr. Borow, on the brief).
William J. Hamilton, Jr., City Attorney, argued the cause for respondent City of New Brunswick (Mr. Hamilton, on the brief).
George J. Otlowski, Jr. argued the cause for respondent C-Town (Mr. Otlowski, on the brief).
Robert J. Lecky argued the cause for respondent New Brunswick Housing Authority (Stamberger & Lecky, attorneys; Mr. Lecky, on the brief).
The opinion of the court was delivered by D'ANNUNZIO, J.A.D.
Plaintiff Davidson Bros., Inc. (Davidson) appeals from a trial court judgment entered after a bench trial held on remand from the Supreme Court. Davidson Bros., Inc. v. D. Katz & Sons, Inc., 121 N.J. 196, 579 A.2d 288 (1990). Applying the reasonableness test formulated by the Supreme Court, the trial court determined that a covenant prohibiting the use as a supermarket of a property in downtown New Brunswick, New Jersey, was unenforceable. We now affirm.
Davidson operated a number of supermarkets in New Jersey. In 1952, it opened a supermarket of 10,000 square feet on George Street in downtown New Brunswick. In June 1978, Davidson took over an existing supermarket located at Elizabeth Street, also in *161 New Brunswick but approximately two miles from the George Street store (hereinafter George Street), near the border with North Brunswick. Davidson paid $315,000 for the assets of the Elizabeth Street store (hereinafter Elizabeth Street), not including inventory, and made a substantial additional investment for improvements. Davidson leased the Elizabeth Street real property.
Davidson closed George Street in February 1979 because its volume had decreased after Davidson acquired Elizabeth Street. It sold George Street in September 1980 to defendant D. Katz & Sons, Inc. (Katz), a rug merchant. The deed to Katz contained the covenant in issue:
The lands and premises described herein and conveyed hereby are conveyed subject to the restriction that said lands and premises shall not be used as and for a supermarket or grocery store of a supermarket type, however designated, for a period of forty (40) years from the date of this deed. This restriction shall be a covenant attached to and running with the lands.
The closing of George Street as a supermarket created a hardship for downtown residents, most of whom did not own or have ready access to motor vehicles. In response to their plight, the city government sought to attract another supermarket operator to the downtown area. The city's efforts culminated in the acquisition of George Street from Katz by the defendant New Brunswick Housing Authority, and the leasing of the property, for one dollar a year, to defendant C-Town, on condition that C-Town invest at least $10,000 for improvements and operate George Street as a supermarket.
Davidson commenced this action to enforce the covenant. Davidson appealed from an adverse summary judgment and we affirmed in an unreported opinion, utilizing traditional "touch and concern" analysis applicable to covenants alleged to run with the land. Davidson Bros., Inc. v. D. Katz & Sons, Inc., No. A-5489-86 (App.Div. Sept. 15, 1988). See generally Caullett v. Stanley Stilwell & Sons, Inc., 67 N.J. Super. 111, 116-18, 170 A.2d 52 (App.Div. 1961).
Our Supreme Court granted Davidson's petition for certification and reversed and remanded for a trial. In doing so, the Court *162 determined that "rigid adherence" to the "touch and concern" requirement was no longer warranted. Davidson Bros. Inc., supra, 121 N.J. at 210, 574 A.2d 288. It held that enforceability of a covenant would depend on its reasonableness, and that the principle of "touch and concern" is "but one of the factors." Ibid. The Court then described eight factors to be considered in resolving the reasonableness issue:
1. The intention of the parties when the covenant was executed, and whether the parties had a viable purpose which did not at the time interfere with existing commercial laws, such as antitrust laws, or public policy.
2. Whether the covenant had an impact on the considerations exchanged when the covenant was originally executed. This may provide a measure of the value to the parties of the covenant at the time.
3. Whether the covenant clearly and expressly sets forth the restrictions.
4. Whether the covenant was in writing, recorded, and if so, whether the subsequent grantee had actual notice of the covenant.
5. Whether the covenant is reasonable concerning area, time or duration. Covenants that extend for perpetuity or beyond the terms of a lease may often be unreasonable. Alexander's v. Arnold Constable, 105 N.J. Super. 14, 27, 250 A.2d 792 (Ch.Div. 1969); Cragmere Holding Corp. v. Socony Mobile Oil Co., 65 N.J. Super. 322, 167 A.2d 825 (App.Div. 1961).
6. Whether the covenant imposes an unreasonable restraint on trade or secures a monopoly for the covenantor. This may be the case in areas where there is limited space available to conduct certain business activities and a covenant not to compete burdens all or most available locales to prevent them from competing in such an activity. Doo v. Packwood, 265 Cal. App.2d 752, 71 Cal. Rptr. 477 (1968); Kettle River R. v. Eastern Ry. Co., 41 Minn. 461, 43 N.W. 469 (1889).
7. Whether the covenant interferes with the public interest. Natural Prods. Co. v. Dolese & Shepard Co., 309 Ill. 230, 140 N.E. 840 (1923).
8. Whether, even if the covenant was reasonable at the time it was executed, "changed circumstances" now make the covenant unreasonable. Welitoff v. Kohl, 105 N.J. Eq. 181, 147 A. 390 (1929).
[Davidson Bros., Inc., supra, 121 N.J. at 211-12, 579 A.2d 288.]
On remand, Davidson no longer sought injunctive relief and abandoned its contention that the one dollar per year lease to C-Town was an unconstitutional use of public property for a private purpose. Those changes in position were caused by Davidson's sale of its Elizabeth Street store to another supermarket operator in 1989 for $687,500. Davidson limited its claim to damages consisting of lost sales and profits during the two year period it *163 competed with C-Town, and the reduced value of its Elizabeth Street store due to C-Town's competition.
Davidson's accountant testified that sales at Elizabeth Street for 1988 and 1989 were $1,452,000 less than they would have been had the George Street store not reopened. He calculated the lost profit on those sales to be $350,000. He also opined that due to the lower sales volume, Davidson sold the Elizabeth Street store for $567,000 less than it should have sold for.
Defendants' accountant disagreed. He testified that although Elizabeth Street may have lost sales due to C-Town's operation of George Street, those lost sales would not have been profitable. Defendants' accountant also testified that the Elizabeth Street store did not lose value as a result of C-Town's competition.
After a lengthy trial, the trial court rendered an oral opinion. Applying the eight factors announced by the Supreme Court, the court found that the 40 year term was unreasonably long (factor 5); that the covenant imposed an unreasonable restraint of trade (factor 6); and that it was contrary to the public interest (factor 7). Regarding factor seven, the court ruled that the covenant adversely impacted the public interest because "there is a substantial public need for the supermarket under the circumstances of this case."
The trial court deemed the damages issue to be moot because of its determination that the covenant was unreasonable and unenforceable. However, the court announced that it was unable to determine from the evidence that Davidson had sustained damages due to C-Town's competition.
We now affirm on the ground that the covenant was so contrary to public policy that it should not be recognized as a valid, enforceable obligation.
The proofs established that New Brunswick is a small city which continues to suffer from many of the maladies affecting the larger cities of New Jersey and the nation, especially in its core downtown area. This area, where George Street is located, has been *164 the focus of a large scale redevelopment and revitalization effort measured in decades. Although this effort's emphasis has been on commercial projects primarily, the downtown area is also the site of many low to moderate income housing projects of the New Brunswick Housing Authority. These were federally funded projects, and many of their residents depended on George Street for their shopping requirements before Davidson closed the store. George Street is within two blocks of four of those housing projects with a total of 726 units.
The testimony of New Brunswick's Director of Policy, Planning and Economic Development, and his report which was introduced into evidence, provided a demographic profile of the city. There are a total of 3,148 households in the downtown area. Twenty-six percent of those households are below the poverty level, compared with seventeen percent in the balance of the city. Of the "family households" downtown, twenty-eight percent are female householders with children, compared with fourteen percent in the balance of the city. Of the female headed households, fifty-four percent are below the poverty level, which is consistent with the balance of the city. Thirty-seven percent of the downtown housing units have no vehicle, almost twice as many as the balance of the city. Seven hundred and forty-three downtown units are occupied by persons sixty-five years and older; twenty-one percent of those seniors are below the poverty level, almost double the proportion in the rest of the city. The downtown area, therefore, contains the city's greatest concentration of disadvantaged persons.
Davidson's closing of George Street further disadvantaged them. No other supermarket was within walking distance. For those who lacked access to motor vehicles, buses, taxis and dependence on others replaced a walk to the supermarket. The problem was especially difficult for female heads of household who used to send their children to the store or have their children accompany them. With the elimination of George Street, getting *165 to the supermarket was a particularly difficult exercise in logistics and child care.
But inconvenience was not the only cost. Dr. James J. O'Connor testified for defendants as an expert in food marketing and distribution. Dr. O'Connor's experience involved hands-on management of his family's wholesale and retail food businesses, followed by academic and government experience in food distribution issues. Shortly before his testimony in this case, Dr. O'Connor had completed a study for the United States Department of Agriculture regarding supermarkets in United States cities. According to Dr. O'Connor, the absence of a supermarket in a low income city neighborhood makes food more expensive[1] and has a negative impact on diet and, therefore, on the inner city population's health.
Dr. O'Connor also stated that the absence of a supermarket contributes to inner city decay, because a supermarket is a retail anchor that attracts other retail operations. Withdrawal of a supermarket tends to force other merchants to leave the same neighborhood. The resulting vacuum is filled by convenience stores or "ma and pa" groceries. They are more expensive and lack variety. They rarely have produce and, if they do have it, it is of poor quality. Moreover, selection of poultry and fish is very limited and very expensive. Dr. O'Connor opined that there is a general lack of inner city supermarkets in the nation, which poses a significant social policy problem.
Dr. O'Connor's uncontradicted testimony is consistent with the conclusions reached by a congressional committee. House Select Comm. on Hunger, 100th Cong., 1st Sess., Obtaining Food: Shopping Constraints on the Poor (Comm. Print 1987) (hereinafter Report). The committee concluded that "low-income consumers are unable to maximize their limited expendable resources for a basic need  food  because of the barriers of the [sic] location and *166 transportation. Hence, the grip of hunger and poverty tightens around the low-income consumer." Id. at 1.
The committee recognized the exacerbating impact of "supermarket migration" on this problem:
SUPERMARKET MIGRATION
During the late 1970's and early 1980's major supermarkets migrated away from the inner cities and low-income areas, toward the suburbs. Major reasons cited for the migration by the food industry include: high insurance rates, employment and security problems, and outmoded and understocked inner-city stores  conditions which keep profits low. The exodus to the suburbs provided cheaper land, better control over operational hazards and, in general, greater profits. According to the Food Marketing Institute, in 1981, 90 percent of the conventional grocery stores, located in low-income neighborhoods, [that] either closed voluntarily or went out of business, did so to relocate into the suburbs. These were the stores that had traditionally served low-income areas. During the same year, over one-half the new stores that opened were super stores locating in the suburbs and other higher-income areas.
As these trends continue, low-income urban and rural consumers are faced with fewer food markets in the immediate vicinity of their homes and the greater expense in accessing reasonably priced foods. This migration has increased the economic drain on the urban and rural low-income consumer's already limited food budget, reducing, and in some cases, removing the opportunity for low-income households to shop competitively.
In Newark, NJ, for example, there were more than a dozen grocery stores that covered the inner-city in 1967, today the people of Newark must travel to larger stores outside their communities. Many inner-city residents are not pleased with this situation, but feel helpless: "I want to know why it's so hard for me to get my shopping done here on Bergen St., so I don't have to pay someone $5 to drive me to Kearny. What it points out  when you are poor, you are totally powerless to control what happens in your neighborhood * * * A supermarket shouldn't be so hard [to find] in a country with so much wealth." Research data substantiates the fact that many low-income families are captive to the stores in their areas.
[Id. at 4 (footnotes omitted).]
The committee also recognized the impact of the inner city consumers' limited shopping choices:
"You have this perverse irony that the poorest have to pay more for a basic necessity of life." Research conducted by organizations such as the Maryland Food Committee, the Department of Labor, and the Commission on Religion in Appalachia (CORA) indicates that evidence that the poor have more restricted access to stores than the nonpoor and are often forced to pay a higher price for food. This is particularly true in areas that are largely black or elderly. Stores having a wider variety of goods and more reasonable prices are more often in higher income areas.

*167 Many low-income neighborhoods are predominantly served by smaller independent grocery stores or "mom and pop" type stores, thereby extremely limiting the consumer's choices. Given the nature of the stores in these areas, the shopper is confronted with limited consumption choices which are often, but frequently have to suffice because of the constraints of their living environment. "Because operating costs are so high, small independent store owners claim they try to maintain lower prices by purchasing lower-grade produce." Still, the prices can be 10 to 15 percent higher than those offered by larger, efficient supermarkets. This is due to the fact that these stores are generally independently operated, and are usually unable to maintain a stock that competes with the larger chain firms.
Based on existing research it is fair to say that supermarket chain store affiliation has an important relationship to improved consumption choices for the economically disadvantaged.
[Id. at 3 (footnotes omitted).]
In its Report, the committee noted that experts and organizations addressing the problems of urban living recommended the provision of incentives to bring supermarkets back into the cities. The committee recommended, among other policy options, that "State and local governments should implement tax breaks and other incentives to ... small- and medium-sized grocery, and supermarket chains to encourage their expansion and/or relocation in low-income communities." Id. at 10;[2]see also Urban Grocery Gap: Hearing Before the House Select Comm. on Hunger, 102d Cong., 2d Sess. (1992) (hearing devoted to various initiatives undertaken to encourage supermarket development in inner cities).
New Brunswick's initial efforts to respond to the problem were unsuccessful. It attempted to provide and organize transportation, an option that proved to be ineffective. It also sought to find a downtown property easily adaptable to supermarket use and to attract another supermarket operator to run it. Other than the George street store, however, there was none available.
*168 Senator John Lynch, the Mayor of New Brunswick during the relevant period, testified that initial approaches to supermarket operators were unsuccessful because too much capital was required to rehabilitate and convert other buildings to supermarket use. According to Senator Lynch the "problem was making the bottom line work because of assembling the property, providing relocation costs, dealing with [environmental] laws, all of those things that add cost to the bottom line." Moreover, many properties that had conversion potential were unavailable or had other problems.
On the other hand, George Street, the former supermarket, was capable of being easily reconverted to supermarket use.
New Jersey courts have refused to enforce contracts that violate public policy. See Vasquez v. Glassboro Service Ass'n, Inc., 83 N.J. 86, 104-05, 415 A.2d 1156 (1980) (contract requiring migrant farmworker to leave barracks immediately upon discharge violates public policy). "No contract can be sustained if it is inconsistent with the public interest or detrimental to the common good." Id. at 98, 415 A.2d 1156.
"The sources of public policy include federal and state legislation and judicial decisions." Ibid. The rehabilitation of our inner cities is a public policy of this State often expressed in relevant legislation.
The New Jersey Economic Development Authority Act (EDA), N.J.S.A. 34:1B-1 to -21, is intended to promote economic development generally throughout the State. As part of the EDA, the Legislature determined that the "provision of buildings, structures and other facilities to increase opportunity for employment in manufacturing, industrial, commercial, recreational, retail and service enterprises in the State is in the public interest." N.J.S.A. 34:1B-2b. The Legislature also specifically addressed the developmental problems of inner cities when it found:
By virtue of their architectural and cultural heritage, their positions as principal centers of communication and transportation and their concentration of productive and energy efficient facilities, many municipalities are capable of ameliorating the conditions of deterioration which impede sound community growth and development; *169 and that building a proper balance of housing, industrial and commercial facilities and increasing the attractiveness of such municipalities to persons of all income levels is essential to restoring such municipalities as desirable places to live, work, shop and enjoy life's amenities.

[N.J.S.A. 34:1B-2f (emphasis added).]
Similarly, in enacting the New Jersey Urban Enterprise Zones Act, N.J.S.A. 52:27H-60 to -89, the Legislature determined that "there persist in this State, particularly in its urban centers, areas of economic distress characterized by high unemployment, low investment of new capital, blighted conditions, obsolete or abandoned industrial or commercial structures, and deteriorating tax bases." N.J.S.A. 52:27H-61a. The Legislature also noted that revitalization of those areas required "application of the skills and entrepreneurial vigor of private enterprise; and it is the responsibility of government to provide a framework within which encouragement be given to private capital investment in these areas, disincentives to investment be removed or abated, and mechanisms be provided for the coordination and cooperation of private and public agencies in restoring the economic viability and prosperity of these areas." N.J.S.A. 52:27H-61 (emphasis added).
In support of these objectives, the Legislature offered a rich variety of subsidies and incentives to businesses operating in a designated enterprise zone. The City of New Brunswick currently is eligible for Open Competitive Urban Enterprise Zone Designation.
Other laws, too numerous to describe in detail, reveal how urban rehabilitation is imbedded in public policy and the public interest. See, e.g., Local Redevelopment and Housing Law, N.J.S.A. 40A:12A-1 to -49 (legislation prescribing powers, duties and functions of local governments in improving areas in need of redevelopment and rehabilitation); Long Term Tax Exemption Law, N.J.S.A. 40A:20-1 to -20 (authorizing local governments to grant tax exemptions to private enterprises in return for their participation in redeveloping and rehabilitating the State's urban centers and distressed communities); Urban Homesteading Act, N.J.S.A. 40A:12-31 to -38 (authorizing municipalities to create *170 "urban homesteading programs" designed to allow for the transfer of municipally owned vacant dwellings to willing applicants for a nominal fee "in order to facilitate their reuse and, equally, to encourage and promote the economic revitalization of this State's urban centers"); N.J.S.A. 40:55-21.15 (authorizing municipalities to designate areas as "urban growth zones" and to encourage the development of such areas by exempting them from the terms and requirements of the municipality's land use ordinances and regulations); N.J.S.A. 17:37A-1 to -27 (creating the New Jersey Insurance Underwriting Association to help attract private capital to central city areas).
Davidson's withdrawal from George Street caused difficulties and hardships of the nature mentioned earlier and made the downtown area a less hospitable and desirable place. Davidson had the right to terminate its George Street operation. In doing so, however, it imposed a restriction on the use of its former property designed to impede the relocation of another supermarket operation to the downtown area. The evidence supports the conclusion that the George Street store was peculiarly suited for supermarket use, and that there were no economically viable substitute locations. Consequently, the covenant, if enforced through injunctive relief or exposure to a judgment for damages, presented a formidable obstacle to remediation of the harm caused by Davidson's withdrawal. Cf. Cipollone v. Liggett Group, Inc., 505 U.S. ___, ___, 112 S.Ct. 2608, 2620, 120 L.Ed.2d 407, 426 (1992) (obligation to pay damages is an effective method of controlling conduct). By harm, we mean the personal hardship caused by the withdrawal of a supermarket as well as the damage to the ongoing efforts of government and private enterprise to revitalize the city. We are persuaded, therefore, that, in the absence of any equivalent reciprocal benefit to the city, Davidson's scorched earth policy is so contrary to the public interest in these circumstances that the covenant is unreasonable and unenforceable. Cf. Shell Oil Co. v. Marinello, 63 N.J. 402, 408-11, 307 A.2d 598 (1973) (where the legislature has declared that the distribution and sale of motor fuels is "affected with a public interest," *171 N.J.S.A. 56:6-19(c), and that distribution and sales through franchise arrangements "vitally affects the general economy of the State, the public interest and the public welfare," N.J.S.A. 56:10-2, contractual provision giving Shell Oil Company the right to terminate its business relationship with its franchisee on 10 days notice was void as against public policy), cert. denied, 415 U.S. 920, 94 S.Ct. 1421, 39 L.Ed.2d 475 (1974); Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 404, 161 A.2d 69 (1960) (because a defectively made automobile is an extremely dangerous instrumentality, an automobile manufacturer's attempted disclaimer of an implied warranty of merchantability "is so inimical to the public good as to compel an adjudication of its invalidity"); In re Terminated Aetna Agents, 248 N.J. Super. 255, 260, 590 A.2d 1189 (App.Div. 1990) ("When enforcement of a contract inflicts injury upon the public in some way, a court will not hesitate to declare that contract void as against public policy."), certif. denied, 126 N.J. 319, 598 A.2d 880 (1991).
Affirmed.
NOTES
[1] According to Dr. O'Connor, "none of us, as well-off as we are, would pay what the poor pay for a bottle of mayonnaise."
[2] The Report cites to earlier studies recognizing the problem of food distribution in inner city and poor rural environments and contains a rich bibliography. See also Shops in Inner Cities: A Sip of Something Good, The Economist, Oct. 10, 1992, at 30; Bill Turque et al., Where the Food Isn't, Newsweek, Feb. 24, 1992, at 36.