1 A.3d 678

GINA STELLUTI, PLAINTIFF–APPELLANT, v. CASAPENN EN-
TERPRISES, LLC, D/B/A POWERHOUSE GYM, DEFENDANT–
RESPONDENT, AND ABI PROPERTY PARTNERSHIP, D/B/A
PAVILION CENTER AND STAR TRAC FITNESS, DEFEN-
DANTS.

Argued March 9, 2010—Decided August 5, 2010.

Albin, J., dissented and filed opinion in which Long, J., joined.

 

*Edward A. Genz* argued the cause for appellant (*Montenegro, Thompson, Montenegro & Genz,* attorneys). *Russell S. Massey* argued the cause for respondent (*Billet & Associates,* attorneys; *Mr. Massey* and *Robert Douglas Billet,* on the briefs).

*E. Drew Britcher* submitted a brief on behalf of amicus curiae New Jersey Association For Justice (*Britcher, Leone & Roth,* attorneys; *Mr. Britcher* and *Jessica E. Choper,* on the brief).

Justice LaVECCHIA delivered the opinion of the Court.

On January 13, 2004, while participating in a spinning [1] class at a private fitness center, the handlebars on plaintiff Gina Stelluti's spin bike dislodged from the bike, causing her to fall and suffer

---

[1] "Spinning" is a popular exercise class offered by fitness centers. It involves riding a stationary bike led by a fitness instructor who gives commands to change positions, adjust the bike's tension, and increase or decrease cadence.

injuries. In this appeal we must determine whether plaintiff should be bound to a pre-injury waiver of liability that she executed in connection with her membership application and agreement. We conclude, for the reasons expressed herein, that the exculpatory agreement between the fitness center and Stelluti is enforceable as to the injury Stelluti sustained when riding the spin bike. In doing so we reject the argument that limited liability waivers are per se invalid in private fitness center venues. Our decision affirms the Appellate Division judgment that upheld the dismissal of plaintiff's claim.

## I.

Stelluti entered into an agreement with defendant Powerhouse Gym [2] for membership at its Brick, New Jersey facility. To do so, she filled out three forms: a "Membership Agreement" form; a "Member Information" form; and a "Health/Safety Consent" form. The "Member Agreement" and "Member Information" forms requested basic personal information. The "Health/Safety Consent" form asked a series of questions about the patron's physical condition, and further, required a patron answering "yes" to any question to submit a doctor's note before commencing physical activity. The form also encouraged patrons to wear "proper footwear and attire," to ask for assistance with equipment or classes, and to notify the manager if medical assistance was needed.

Stelluti completed the forms, signed and dated them, and answered "no" in response to all questions on the "Health/Safety Consent" form. That same day, she also signed and dated a "Powerhouse Fitness (The Club) Waiver & Release Form" (waiver).[3] The waiver, a standard pre-printed form drafted exclusively for Powerhouse, provided as follows:

---

[2] Powerhouse Gym is a trade name of Casapenn Enterprises, LLC.

[3] Plaintiff has claimed in her certification and deposition that the Powerhouse employee did not tell her that she was signing a release form. She also claimed she was not provided with a personal copy of the signed release.

POWERHOUSE FITNESS (The Club)

WAIVER & RELEASE FORM

Because physical exercise can be strenuous and subject to risk of serious injury, the club urges you to obtain a physical examination from a doctor before using any exercise equipment or participating in any exercise activity. You (each member, guest, and all participating family members) agree that if you engage in any physical exercise or activity, or use any club amenity on the premises or off premises including any sponsored club event, you do so **entirely at your own risk.** Any recommendation for changes in diet including the use of food supplements, weight reduction and or body building enhancement products are entirely your responsibility and you should consult a physician prior to undergoing any dietary or food supplement changes. You agree that you are voluntarily participating in these activities and use of these facilities and premises **and assume all risks** of injury, illness, or death. We are also not responsible for any loss of your personal property.

This waiver and release of liability includes, without limitation, all injuries which may occur as a result of, (a) your use of all amenities and equipment in the facility and your participation in any activity, class, program, personal training or instruction, (b) the sudden and unforeseen malfunctioning of any equipment, (c) our instruction, training, supervision, or dietary recommendations, and (d) your slipping and/or falling while in the club, or on the club premises, including adjacent sidewalks and parking areas.

You acknowledge that you have carefully read this "waiver and release" and fully understand that it is a **release of liability.** You expressly agree to release and discharge the health club, and all affiliates, employees, agents, representatives, successors, or assigns, from any and all claims or causes of action and you agree to voluntarily give up or waive any right that you may otherwise have to bring a legal action against the club for personal injury or property damage.

To the extent that statute or case law does not prohibit releases for negligence, this release is also for negligence on the part of the Club, its agents, and employees.

If any portion of this release from liability shall be deemed by a Court of competent jurisdiction to be invalid, then the remainder of this release from liability shall remain in full force and effect and the offending provision or provisions severed here from.

By signing this release, I acknowledge that I understand its content and that this release cannot be modified orally.

Signed: /s/ Gina Stelluti Names of family members (if applicable):

Printed Name:

Dated: 1/13/04

Any patron who declined to sign the waiver was not permitted to use the Powerhouse Gym.

Stelluti's injury occurred at the gym the day that she joined. After signing the requisite paperwork to become a member, she

went to participate in a spinning class. She advised the instructor of her inexperience and the instructor helped her to adjust the bike seat for height and showed her how to strap her feet to the pedals. The instructor then told Stelluti to watch and imitate her during the class.

As the class began, the participants started out pedaling in a seated position. Shortly afterward, the instructor told the participants to change from a seated to a standing position on their bikes. When Stelluti rose to a standing position, the handlebars dislodged from the bike.[4] As a result, Stelluti fell forward while her feet remained strapped to the pedals. With assistance, she succeeded in detaching herself from the bike. When she tried to resume participation after resting for fifteen minutes, she soon had to quit, finding herself in too much pain to continue.

Stelluti's injuries included pain in her neck and shoulders, soreness in her thighs and back, a cracked tooth, and bruises on her legs. After a hospital visit, she was diagnosed with back and neck strain, prescribed medication, and discharged with a recommendation for a follow-up appointment with a doctor. She claims also to experience persistent pain as a result of the incident. Her medical expert has stated that three years after her accident Stelluti suffers from chronic pain associated with myofascial pain syndrome.[5]

Stelluti filed a timely complaint for damages in the Law Division against Powerhouse; Star Trac, the manufacturer of the spin bikes used at Powerhouse; and ABI Property Partnership, the premises owner. The complaint alleged the following negligence

---

[4] As stated by Stelluti, she did not pull up on the handlebars as she stood. Rather, she described the handlebars as feeling loose as she held onto them when rising. She also said that she did not detect that the handlebars were loose before she stood up in the pedals.

[5] Myofascial pain syndrome is described as on-going or long-lasting pain stemming from the connective tissue (fascia) of muscles. WebMD, Myofascial Pain Syndrome, http://www.webmd.com/a-to-z-guides/myofascial-pain-syndrome-topic-overview.

claims against Powerhouse and ABI: 1) "fail[ing] to properly maintain and set up the stationary bike"; 2) "fail[ing] to properly instruct the plaintiff as to how to use the bike [or] exercise proper care"; 3) "caus[ing] a dangerous and hazardous condition to exist"; 4) "allow[ing] a nuisance to exist"; 5) "fail[ing] to provide proper safeguards or warnings on the bike"; 6) "fail[ing] to provide proper and safe equipment"; 7) "maintain[ing] the bike in an unsafe, hazardous and/or defective manner"; and 8) acting in "a negligent, careless and reckless manner so as to cause an unsafe hazardous and/or defective condition to exist ... [and failing] to provide proper safeguards and/or warnings." Plaintiff also asserted a products liability claim against Star Trac Fitness.[6]

This appeal comes to us from a summary judgment record. That record reveals the following contrasting views about the spin bike that was involved in Stelluti's fall and resultant injuries.

Powerhouse submitted an expert liability report that described the mechanics of a Star Trac Fitness Johnny G. Spinner Pro bike. According to that expert's examination of an exemplar bike,[7] the handlebars have a chrome stem post and the entire, unitary piece—handlebars and post—may be detached and separated from the bike frame. The chrome post, which is approximately seven inches tall, contains seven elevation positioning holes, each approximately three-quarters of an inch apart. At the lower end of the post, a horizontal line and arrow, pointing down to the word "Maximum," indicates the furthest extension point of the post. However, Powerhouse's expert opined that an inexperienced user "would not notice th[at] mark." The chrome post fits into a

---

[6] Defendants Star Trac and ABI are no longer parties to the case. ABI was not represented at oral argument on Powerhouse's motion for summary judgment, nor was ABI a party to the case before the Appellate Division. *See Stelluti v. Casapenn Enters.,* 408 *N.J.Super.* 435, 443 n. 3, 975 *A.2d* 494 (App.Div.2009). Further, we were informed at oral argument that plaintiff's claims against Star Trac have been resolved.

[7] The actual bike on which Stelluti had sustained her injury could not be identified.

vertical support member that extends from the bike's frame base. A locking pin—a threaded rod fitted with a spring-loaded pin and handle—secures the post to the frame. The pin is inserted into one of the elevation holes and is locked into place by tightening its handle. The expert noted that there is "no noticeable difference" between the appearance of the post when it is locked in place or when the post merely is resting on top of an elevation locking pin. Powerhouse's expert concluded that plaintiff's accident "occurred because the handlebars present on the stationary exercise bicycle that she was using unexpectedly and without warning separated from the bicycle causing her to fall."

Stelluti's liability expert, a college professor with an advanced degree in physical education and certifications in specialized fitness activities including spinning instruction, issued a report that opined that Powerhouse was "negligent in providing a safe environment" and, specifically that the spinning instructor "failed to provide effective specific supervision, instruction and assistance" to Stelluti. He also stated that Stelluti sustained her injuries as a result of the handlebar stem becoming dislodged from the locked position and explained how the handlebars may be raised or lowered, and locked into place, consistent with defendant's liability expert. Plaintiff's expert also agreed with those statements by defendant's representatives, the spinning instructor, and plaintiff, that the only way the handlebars could have become dislodged would be if the lock pin had not been engaged and, instead, the stem had been resting on the lock pin. He explained that, when in that position, the stem would recede only one inch into the vertical support member, thus creating an unstable position for the handlebars. Therefore, when plaintiff raised herself from a seated position, and leaned forward and downward on the handlebars, the handlebars and post would separate from the frame.

Stelluti's expert report also referenced a protocol [8] that, he said, every certified spinning instructor should follow, including "proper

---

[8] The expert referred to the Madd Dog Athletics Johnny G. Spinning Instructor Manual.

handlebar height adjustment" before each class to "help ensure a comfortable position on the bike and avoid undue strain on the back." The protocol noted that students should be reminded "to check that the 'pop pin' is fully engaged in to make sure that the handlebars are secure." The expert also referred to the Star Trac Group Cycles Owners Guide, which emphasized that "[p]roper instruction from a certified Spinning instructor should be used to properly fit the group cycle for use" and that "[u]sers should be aware of the features, functions and proper operation of the cycle *before* using the cycle for the first time." In conclusion, Stelluti's expert report stated that "[t]he proximal cause and mechanism of injury are a direct result of a lack of appropriate instructions in setting up the plaintiff's bike by the instructor."

As noted, defendant filed a motion for summary judgment. Before ruling, the trial court required additional briefing on whether common law premises liability imposed an affirmative duty that served to invalidate the use of an exculpatory agreement in this setting. Following submission of that additional briefing and argument, the court entered an order granting summary judgment in favor of Powerhouse, finding Powerhouse's waiver effective to exculpate it from plaintiff's negligence claims. The judge made several findings: 1) that the exculpatory agreement was enforceable because Powerhouse was not subject to a require-ment to perform under a specific legal duty imposed by statute or by regulation; 2) that the waiver signed by Stelluti was not unconscionable and, further, that plaintiff had read and under-stood the agreement provisions when she signed them; and 3) that the exculpatory language would be applied to cover claims sound-ing in both negligence and gross negligence.

Plaintiff appealed, and in a comprehensive decision penned by Judge Sabatino, the Appellate Division affirmed the order grant-ing summary judgment to defendant. *Stelluti v. Casapenn En-ters.*, 408 *N.J.Super.* 435, 440, 975 *A.2d* 494 (App.Div.2009). Im-portantly, the appellate decision pared back the permissible reach of defendant's exculpatory agreement with its patrons, holding

"that the exculpatory agreement only insulated [defendant] from ordinary negligence respecting the use of the exercise equipment at its facility," and that the agreement could not insulate defendant from "extreme conduct such as reckless, willful or wanton, or palpably unreasonable acts or omissions diminishing the safe condition of its equipment." *Id.* at 439, 975 *A.*2d 494. Acknowledging that a fitness club owes a general duty to invitees who come onto its premises, the panel explained that the question was whether, and to what extent, the agreement entered into by Stelluti eliminated the duty that Powerhouse owed to her. *Id.* at 446, 448, 975 *A.*2d 494.

Recognizing that the standardized pre-printed document required for membership to the club constituted a contract of adhesion, *id.* at 448–50, 975 *A.*2d 494, the panel first applied the factors identified in *Rudbart v. North Jersey District Water Supply Comm'n,* 127 *N.J.* 344, 356, 605 *A.*2d 681 (1992), and determined that the agreement was not unconscionable and therefore was valid. *Stelluti, supra,* 408 *N.J.Super.* at 449–50, 975 *A.*2d 494. The panel then addressed the agreement's enforceability in light of its exculpatory nature. *Id.* at 453, 975 *A.*2d 494. In performing that inquiry, the panel considered the test that had been identified by another appellate panel in *Gershon v. Regency Diving Ctr., Inc.,* 368 *N.J.Super.* 237, 248, 845 *A.*2d 720 (App.Div. 2004), which stated that an exculpatory agreement

is enforceable only if: (1) it does not adversely affect the public interest; (2) the exculpated party is not under a legal duty to perform; (3) it does not involve a public utility or common carrier; or (4) the contract does not grow out of unequal bargaining power or is otherwise unconscionable.

[*Id.* at 454, 975 *A.*2d 494 (citing *Gershon, supra,* 368 *N.J.Super.* at 248, 845 *A.*2d 720).]

Addressing considerations one, two, and four under *Gershon* (because the third plainly was inapplicable), the panel explained that Powerhouse has a general legal duty to its business invitee patrons and, therefore, "[a]n unbounded waiver of liability [would] unjustifiably eviscerate[ ] those protections for business invitees." *Id.* at 454–55, 975 *A.*2d 494. However, the panel also cited other countervailing public policy considerations, including the impor-

tance of encouraging physical fitness and the necessity for fitness facilities to have access to the protections of exculpatory agreements due to the potential for substantial financial exposure from injuries associated with exercise equipment and activities in a gym. *Id.* at 455–57, 975 *A.*2d 494. The panel balanced those public interest and policy considerations against the state interest in the established common law on premises liability, and found that although the public policy interests could not justify a complete waiver of liability, the exculpatory agreement was valid but required some paring. *Id.* at 457–59, 975 *A.*2d 494 (stating that "[i]f Powerhouse, or any other fitness club, so sharply deviated from the ordinary standards of reasonable care, public policy dictates that the exculpatory agreement should not protect it from liability"). The panel held that Powerhouse's exculpatory agreement could only immunize it from ordinary negligence and not "reckless, willful or wanton, or palpably unreasonable [behavior]." *Id.* at 439, 975 *A.*2d 494.

Focusing on the liability question raised by the facts in this matter, and expressly not addressing the validity of the agreement either as to hazards posed by other equipment on the premises not used routinely for exercising or as to other dangerous conditions that could arise on any premises, the panel addressed whether plaintiff's proofs raised her above the exculpatory bar against liability for ordinary negligence associated with use of the fitness equipment. *Id.* at 459–60, 975 *A.*2d 494. The appellate panel concluded, like the trial court, that it could not determine exactly how the handlebars became detached, but that, even if the instructor had failed to check the handlebars, or a cleaning-crew member mistakenly had removed the pin, and the equipment was not examined before Stelluti or any other patron was allowed to use the equipment, those acts did not rise to a reckless or extreme deviation from a duty of care. *Id.* at 460, 975 *A.*2d 494.[9] In sum,

---

[9] The panel also found that the record presented no evidence that Powerhouse had neglected over time to maintain its equipment. *Stelluti, supra,* 408 *N.J.Super.* at 460–61, 975 *A.*2d 494.

even though the agreement attempted to protect Powerhouse from acts or omissions concerning the safety of its equipment that constituted more than ordinary negligence, because there was no genuine issue of fact that rose above a cause of action in ordinary negligence, the panel held that summary judgment in favor of Powerhouse was proper and affirmed the judgment. *Id.* at 460–61, 975 *A.*2d 494.

We granted plaintiff's petition for certification, 200 *N.J.* 502, 983 *A.*2d 1110 (2009). Plaintiff argues that the language of the agreement was unclear and ambiguous, and thus inadequate; that it is an unconscionable contract of adhesion not entitled to be enforced; and that it is contrary to public policy to allow an exculpatory agreement to be applied in the instant context. In respect of her last point, plaintiff maintains that the spinning instructor's failure to check the handlebars before she allowed Stelluti to mount the bike and begin the spin class amounted to gross negligence and, therefore, summary judgment should not have issued.

Powerhouse refutes each of plaintiff's arguments, and generally agrees with the reasoning of the Appellate Division decision, parting company only as to the panel's holding that declared the agreement inapplicable to gross negligence claims.

## II.

The issue of general public importance in this appeal, *see R.* 2:12–4, concerns the enforceability of an exculpatory agreement executed in a commercial setting involving membership in an exercise facility, where the exculpation brought about by the agreement does not implicate the violation of any statutory or regulatory legal duty owed by the facility. It is not the circumstances of the forming of this take-it-or-leave-it waiver agreement that drew our attention, although that is among Stelluti's points of error in seeking certification. We reject that claim of error in her petition and, substantially for the reasons expressed in Judge Sabatino's opinion, we affirm the Appellate Division's assessment

of this agreement as a contract of adhesion but one that does not suffer from procedural unconscionability concerns. We add briefly the following.

A contract of adhesion is defined as one "presented on a take-it-or-leave-it basis, commonly in a standardized printed form, without opportunity for the 'adhering' party to negotiate." *Rudbart, supra,* 127 *N.J.* at 353, 605 *A.*2d 681 (citations omitted). Although a contract of adhesion may require one party to choose either to accept or reject the contract as is, the agreement nevertheless may be enforced. *See id.* at 353, 356–61, 605 *A.*2d 681 (noting such considerations as "the subject matter of the contract, the parties' relative bargaining positions, the degree of economic compulsion motivating the 'adhering' party, and the public interests affected by the contract"). Plainly, courts can, and do, refuse to enforce an unconscionable contract of adhesion. *See Muhammad v. County Bank of Rehoboth Beach, Del.,* 189 *N.J.* 1, 15, 912 *A.*2d 88 (2006). When making the determination that a contract of adhesion is unconscionable and unenforceable, we consider, using a sliding scale analysis, the way in which the contract was formed and, further, whether enforcement of the contract implicates matters of public interest. *Delta Funding Corp. v. Harris,* 189 *N.J.* 28, 39–40, 912 *A.*2d 104 (2006).[10]

Here, Powerhouse's agreement was a standard pre-printed form presented to Stelluti and other prospective members on a typical "take-it-or-leave-it basis." No doubt, this agreement was one of adhesion. As for the relative bargaining positions of the parties, *see Rudbart, supra,* 127 *N.J.* at 356, 605 *A.*2d 681, we assume that Stelluti was a layperson without any specialized knowledge about contracts generally or exculpatory ones specifi-

---

[10] As *Delta Funding, supra,* exemplifies, a finding of a high level of procedural unconscionability alone may not render an entire agreement unenforceable. 189 *N.J.* at 40–41, 912 *A.*2d 104 (holding contract one of adhesion but not unenforceable, despite finding one party to possess greater sophistication and bargaining power).

cally. Giving her the benefit of all inferences from the record, including that Powerhouse may not have explained to Stelluti the legal effect of the contract that released Powerhouse from liability, we nevertheless do not regard her in a classic "position of unequal bargaining power" such that the contract must be voided. As the Appellate Division decision noted, Stelluti could have taken her business to another fitness club, could have found another means of exercise aside from joining a private gym, or could have thought about it and even sought advice before signing up and using the facility's equipment. No time limitation was imposed on her ability to review and consider whether to sign the agreement. In sum, although the terms of the agreement were presented "as is" to Stelluti, rendering this a fairly typical adhesion contract in its procedural aspects, we hold that the agreement was not void based on any notion of procedural unconscionability.

To the extent that any contract of adhesion also would require review to determine whether its enforcement implicates a matter of public interest, *see ibid.*, that test overlaps, and is subsumed by the more precise analysis employed when assessing whether to enforce an exculpatory agreement. We therefore turn to consider the specific type of contract whose enforceability is the reason certification was granted in this appeal.

### III.

As a general and long-standing matter, contracting parties are afforded the liberty to bind themselves as they see fit. *See Twin City Pipe Line Co. v. Harding Glass Co.*, 283 *U.S.* 353, 356, 51 *S.Ct.* 476, 477, 75 *L.Ed.* 1112, 1116 (1931) ("The general rule is that competent persons shall have the utmost liberty of contracting and that their agreements voluntarily and fairly made shall be held valid and enforced in the courts."). *See generally* 11 *Williston on Contracts* § 30:9, at 96 (Lord ed., 4d ed. 1999). Out of respect for that very basic freedom, courts are hesitant to interfere with purely private agreements. *See, e.g., Twin City Pipe Line Co., supra,* 283 *U.S.* at 356–57, 51 *S.Ct.* at 477, 75 *L.Ed.*

at 1116 (evaluating unenforceability with "caution"); *Allen v. Commercial Cas. Ins. Co.*, 131 *N.J.L.* 475, 478, 37 *A.2d* 37 (E. & A.1944) (finding freedom to contract "sacred," and thus not to be interfered with "lightly" (citation omitted)); *Chem. Bank v. Bailey*, 296 *N.J.Super.* 515, 526–27, 687 *A.2d* 316 (App.Div.) (noting ability of parties to apportion risk of loss through contractual limitation of liabilities), *certif. denied*, 150 *N.J.* 28, 695 *A.2d* 671 (1997).

■ However, certain categories of substantive contracts, including those that contain exculpatory clauses, have historically been disfavored in law and thus have been subjected to close judicial scrutiny. *See* 11 *Williston on Contracts, supra,* § 30:9, at 103–04 (citing types of contractual provisions that require strict construction, including "forfeitures, penalties, provisions limiting a party's legal rights, and provisions that depend for their validity or enforceability on the subjective judgment of one of the parties"). Our Court previously expressed a similar disfavor for such agreements and applied careful scrutiny to the interests involved. *See Hojnowski v. Vans Skate Park,* 187 *N.J.* 323, 333, 901 *A.2d* 381 (2006) (holding unenforceable parent's execution of exculpatory agreement on behalf of child). That said, despite the warnings about disfavor and calls for careful scrutiny, we do enforce contracts that contain exculpatory clauses unless such provision proves adverse to the public interest. *See Mayfair Fabrics v. Henley,* 48 *N.J.* 483, 487, 226 *A.2d* 602 (1967).

■ In that consideration, it has been held contrary to the public interest to sanction the contracting-away of a statutorily imposed duty. *McCarthy v. NASCAR, Inc.,* 48 *N.J.* 539, 542, 226 *A.2d* 713 (1967). An agreement containing a pre-injury release from liability for intentional or reckless conduct also is plainly inconsistent with public policy. *See Hojnowski, supra,* 187 *N.J.* at 333, 901 *A.2d* 381. Beyond those clear parameters to inviolate public policy principles, the weighing process becomes opaque. The Appellate Division identified four considerations, pertinent to the enforcement of an exculpatory agreement, when rendering its

decision in *Gershon.* The *Gershon* court said that an exculpatory agreement

> will be enforced if (1) it does not adversely affect the public interest; (2) the exculpated party is not under a legal duty to perform; (3) it does not involve a public utility or common carrier; or (4) the contract does not grow out of unequal bargaining power or is otherwise unconscionable.
>
> [*Gershon, supra,* 368 *N.J.Super.* at 248, 845 *A.*2d 720 (citations omitted).]

The *Gershon* test, used by the panel below, captures the essential features to be explored when considering whether enforcement of an exculpatory agreement would be contrary to public policy. Other courts in sister jurisdictions have developed similar tests. One, which originated with the Supreme Court of California in *Tunkl v. Regents of the University of California,* 60 *Cal.*2d 92, 32 *Cal.Rptr.* 33, 383 *P.*2d 441, 445–46 (1963), uses six inquiries [11] and it also has been identified as helpful. *See Hojnowski, supra,* 187 *N.J.* at 348, 901 *A.*2d 381 (LaVecchia, J., dissenting). Although slightly more nuanced, *Tunkl's* considerations are not inconsistent with *Gershon's,* and can provide additional guidance when applying the *Gershon* test that has been employed by our appellate courts and that we find acceptable also in the resolution of the instant exculpatory agreement. We thus turn to consider the specifics of the agreement.

## IV.

### A.

As a threshold matter, to be enforceable an exculpatory agreement must "reflect the unequivocal expression of the

---

[11] *Tunkl* references the following inquiries as pertinent when determining whether to enforce an exculpatory agreement: 1) whether the agreement involves a business generally suitable for public regulation; 2) whether the exculpated party provides a service important and necessary to the public; 3) whether the exculpated party offers services to any person of the public seeking those services; 4) whether the exculpated party possesses a stronger bargaining power relative to the member of the public seeking services; 5) whether the exculpated party presents the member of the public with a contract of adhesion; and 6) whether the member of the public is under the control of the exculpated party and thus is subject to the careless risks of the more powerful party. *Tunkl, supra,* 32 *Cal.Rptr.* 33, 383 *P.*2d at 445–46.

party giving up his or her legal rights that this decision was made voluntarily, intelligently and with the full knowledge of its legal consequences." *Gershon, supra,* 368 *N.J.Super.* at 247, 845 *A.2d* 720 (citing *Knorr v. Smeal,* 178 *N.J.* 169, 177, 836 *A.2d* 794 (2003); *Country Chevrolet, Inc. v. Twp. of N. Brunswick Planning Bd.,* 190 *N.J.Super.* 376, 380, 463 *A.2d* 960 (App.Div.1983)). When a party enters into a signed, written contract, that party is presumed to understand and assent to its terms, unless fraudulent conduct is suspected. *Rudbart, supra,* 127 *N.J.* at 353, 605 *A.2d* 681.

The agreement in question explicitly stated that it covered "the sudden and unforeseen malfunctioning of any equipment, . . . use of all amenities and equipment in the facility and . . . participation in any activity, class, program, personal training or instruction." In addition, the agreement explicitly covered negligence: "this release is also for negligence on the part of the Club, its agents, and employees." Further, terms that limited Powerhouse's liability—"entirely at your own risk," "assume all risks," and "release of liability,"—were set forth prominently in the written document that Stelluti signed and from which she now seeks to be excused. Although Stelluti argues that she did not know what she was signing, she does not claim that she signed the waiver form as the result of fraud, deceit, or misrepresentation. Therefore, the trial court was well within reason to presume that she understood the terms of the agreement, *see ibid.,* and the finding to that effect is unassailable.

Furthermore, as we have already addressed and rejected Stelluti's argument in respect of unequal bargaining power, we need address that aspect of *Gershon's* inquiries no further. And, because Powerhouse is not a public utility or common carrier, that inquiry is inapplicable to our analysis. Besides not being such an entity, Powerhouse also was not providing a necessary service akin to that provided by a public utility or common carrier. Thus refined, our analysis in this matter turns on the first two inquiries identified in *Gershon, supra:* whether enforcement will implicate a

matter of public interest and the related question of whether Powerhouse is under some legal duty to perform. 368 *N.J.Super.* at 248, 845 *A.*2d 720.

### B.

 When considering whether enforcement of the instant exculpatory agreement would adversely affect the public interest, the inquiry naturally blends into an examination of whether the exculpated party is under a legal duty to perform. Exculpatory agreements that attempt to release liability for statutorily imposed duties have been held invalid. *See, e.g., McCarthy, supra,* 48 *N.J.* at 543, 226 *A.*2d 713 (holding exculpatory clause limiting liability arising out of car racing unenforceable due to statute regulating field and its expressed public policy in protecting participants and spectators). When the subject of an exculpatory agreement is not governed by statute, we also have considered common law duties in weighing relevant public policy considerations. *See Hojnowski, supra,* 187 *N.J.* at 335, 901 *A.*2d 381. To a certain extent, we cannot view *Gershon's* public-interest inquiry separate from the question of whether there is a legal duty owed that is inviolate and non-waivable. In performing the weighing of public policy interests, then, we must take into account, in this private setting, both the extant common law duties and the right to freely agree to a waiver of a right to sue, which is part and parcel to the freedom to contract to which we earlier adverted. The mere existence of a common law duty does not mean that there is no room for an exculpatory agreement. In other words, our analysis begins from the starting point that public policy does not demand a per se ban against enforcement of an exculpatory agreement based on the mere existence of a duty recognized in the common law in respect of premises liability.

 It is well recognized that the common law imposes a duty of care on business owners to maintain a safe premises for their business invitees because the law recognizes that an owner is in the best position to prevent harm. *See Nisivoccia v. Glass*

*Gardens, Inc.*, 175 *N.J.* 559, 563, 818 *A.*2d 314 (2003); *Kuzmicz v. Ivy Hill Park Apartments, Inc.*, 147 *N.J.* 510, 517, 688 *A.*2d 1018 (1997). That standard of care encompasses a duty "to guard against any dangerous conditions on [the] property that the owner either knows about or should have discovered[,] ... [and] to conduct a reasonable inspection to discover latent dangerous conditions." *Hopkins v. Fox & Lazo Realtors*, 132 *N.J.* 426, 434, 625 *A.*2d 1110 (1993) (citations omitted). That said, the law recognizes that for certain activities conducted by operation of some types of business, particularly those that pose inherent risks to the participant, the business entity will not be held liable for injuries sustained "so long as [the business] has acted in accordance with 'the ordinary duty owed to business invitees, including exercise of care commensurate with the nature of the risk, foreseeability of injury, and fairness in the circumstances.' " *Hojnowski, supra*, 187 *N.J.* at 340–41, 901 *A.*2d 381 (citation omitted). When it comes to physical activities in the nature of sports—physical exertion associated with physical training, exercise, and the like—injuries are not an unexpected, unforeseeable result of such strenuous activity.

Our Court recognized that reality associated with sports and sport activity when we held that some activities, due to their very nature, require the participant to assume some risk because injury is a common and inherent aspect of the activity. *Crawn v. Campo*, 136 *N.J.* 494, 500, 643 *A.*2d 600 (1994). In *Crawn*, we considered the duty of care owed to individuals who participate in informal recreational sports, softball in that particular instance. *Id.* at 497, 643 *A.*2d 600. We determined that the standard of care must exceed mere negligence because of the inherent risk of injury that cannot be eliminated through the exercise of reasonable care. *Id.* at 500, 643 *A.*2d 600. To determine the proper standard of care, we focused on the relationship between the participants and the nature of risk involved, specifying unique aspects of recreational activities such as the inherent and expected physical contact and high level of emotional intensity, both deemed appropriate when participating in those sports. *Id.* at 504, 643

A.2d 600. We stressed the centrality of public policy and fairness in reaching our conclusion about the appropriate standard of care. *Id.* at 503, 643 *A.*2d 600. Two important public policies were identified: 1) "promotion of vigorous participation in athletic activities" as evidenced by pervasive interest and participation in recreational sports, and 2) the "avoid[ance of] a flood of litigation." *Id.* at 501, 643 *A.*2d 600. That said, those interests do not completely immunize participants. *Id.* at 503–04, 643 *A.*2d 600. Participants retain a duty to participate in a reasonable manner, with regard for other players, and also in a way that fits with the common expectations of acceptable conduct for the activity. *Id.* at 501, 507, 643 *A.*2d 600. Thus, the *Crawn* decision held that "liability arising out of mutual, informal, recreational sports activity should not be based on a standard of ordinary negligence but on the heightened standard of recklessness or intent to harm," *id.* at 503, 643 *A.*2d 600, a standard that "recognizes a commonsense distinction between excessively harmful conduct and the more routine rough-and-tumble of sports that should occur freely on the playing fields." *Id.* at 508, 643 *A.*2d 600. Application of that standard later was extended to sports that do not involve physical contact. *See Schick v. Ferolito,* 167 *N.J.* 7, 18, 767 *A.*2d 962 (2001) (upholding recklessness standard to the game of golf, finding "no persuasive reasons to apply an artificial distinction between 'contact' and 'noncontact' sports").

Assumption of risk associated with physical-exertion-involving discretionary activities is sensible and has been applied in many other settings, including by the Legislature with reference to certain types of recreational activities. Recognizing that some activities involve a risk of injury and thus require risk sharing between participants and operators, the Legislature has enacted statutes that delineate the allocation of risks and responsibilities of the parties who control and those who participate in some of those activities. *See N.J.S.A.* 5:13–1 to –11 (Ski Act); *N.J.S.A.* 5:14–1 to –7 (Roller Skating Rink Safety and Fair Liability Act); *N.J.S.A.* 5:15–1 to –12 (Equine Act). Although no such action has been taken by the Legislature in respect of private fitness centers,

that does not place the common sense of a risk-sharing approach beyond the reach of commercial entities involved in the business of providing fitness equipment for patrons' use. The sense behind that approach does not make it unreasonable to employ exculpatory agreements, within limits, in private contractual arrangements between fitness centers and their patrons.

An exculpatory agreement that covered a unique form of recreational activity was considered previously in *Hojnowski*, *supra*, where we held unenforceable an exculpatory agreement executed by a parent on behalf of a minor seeking to use a skateboarding facility. 187 *N.J.* at 338, 901 *A.*2d 381. The relevant public policy implicated by that case centered on the state's parens patriae power over minors and the need to encourage commercial recreational facilities that attract children to take reasonable steps to ensure children's safety. *Id.* at 333–38, 901 *A.*2d 381. Due to the perceived public interest in that unique context, we concluded that the exculpatory agreement would not bar the minor's tort claim. *Id.* at 338, 901 *A.*2d 381. Importantly, the Court's holding treated skateboarding as a non-essential activity that did not implicate the public interest. *Id.* at 347–48, 901 *A.*2d 381 (LaVecchia, J., dissenting). Further, we did not decide whether the exculpatory agreement would be valid if executed and enforced against an adult. *Id.* at 347, 901 *A.*2d 381. The decision in *Hojnowski* does not stand for the proposition that there exists a per se ban, based on the common law duty owed to business invitees concerning premises liability, against the enforcement of an exculpatory agreement in personal recreational-type activities including, as here, private fitness centers. Thus, in considering *Gershon's* legal-duty question and whether the public interest would be adversely affected by enforcement of the instant exculpatory agreement, we find it necessary to engage in a balancing of all relevant public-policy interests.[12]

---

[12] The dissent conflates those two considerations by arguing, in substance, that it is contrary to the public interest even to allow for an exculpation provision that pertains to premises liability under the common law. Indeed, the dissent

## C.

To properly balance the public-policy interests implicated in the instant matter one must consider the nature of the activity and the inherent risks involved.[13] Engaging in physical activity, particularly in private gyms and health clubs is commonplace in today's society. The United States Bureau of Labor estimates that over the next decade jobs for physical fitness workers will increase faster than other occupations due to the increasing recognition of health benefits associated with physical activity and, consequently, increase the amount of time and money spent on fitness. U.S. Dep't of Labor, *Bureau of Labor Statistics: Occupational Outlook Handbook* 3 (2010–11), http://www.bls.gov/oco/pdf/ocos296.pdf.

By its nature, exercising entails vigorous physical exertion.[14] Injuries from exercise are common; indeed minor injuries can be expected—for example, sore muscles following completion of a tough exercise or workout may be indicative of building or toning muscles. Those injuries and others may result from faulty equipment, improper use of equipment, inadequate instruction, inexperience or poor physical condition of the user, or excessive exertion. ·See Thomas M. Fleming, Annotation, *Liability of Proprietor of Private Gymnasium, Reducing Salon, or Similar Health Club for Injury to Patron,* 79 *A.L.R.*4th 127, § 2[a] (1990).

---

goes even further, by converting *Gershon's* first inquiry into a requirement that the exculpatory agreement serve the public interest. *See post* at 323, 1 *A.*3d at 687. Plainly, that recharacterization does not fairly reflect our jurisprudence.

[13] Our focus here substantially contemplates one of *Tunkl's* inquiries, specifically whether the member of the public is under the control of the exculpated party and thus subject to the careless risks by the more powerful party. *See Tunkl, supra,* 32 *Cal.Rptr.* 33, 383 *P.*2d at 445–46. That question takes into account the patron's opportunity for self-protection, which removes the possibility that the injury could only be prevented by the operator. *See* Robert Heidt, *The Avid Sportsman and the Scope for Self-Protection: When Exculpatory Clauses Should be Enforced,* 38 *U. Rich. L.Rev.* 381, 460–73 (2004).

[14] The dictionary defines the term "exercise" as "[a]ctivity requiring physical or mental exertion, esp. when performed to maintain or develop fitness." *Webster's II New College Dictionary* 392 (2d ed. 1999).

Although there is public interest in holding a health club to its general common law duty to business invitees—to maintain its premises in a condition safe from defects that the business is charged with knowing or discovering—it need not ensure the safety of its patrons who voluntarily assume some risk by engaging in strenuous physical activities that have a potential to result in injuries. Any requirement to so guarantee a patron's safety from *all* risk in using equipment, which understandably is passed from patron to patron, could chill the establishment of health clubs. Health clubs perform a salutary purpose by offering activities and equipment so that patrons can enjoy challenging physical exercise. There has been recognized a "positive social value" in allowing gyms to limit their liability in respect of patrons who wish to assume the risk of participation in activities that could cause an injury. *See* Robert Heidt, *The Avid Sportsman and the Scope for Self-Protection: When Exculpatory Clauses Should be Enforced*, 38 *U. Rich. L.Rev.* 381, 389 (2004). And, further, it is not unreasonable to encourage patrons of a fitness center to take proper steps to prepare, such as identifying their own physical limitations and learning about the activity, before engaging in a foreign activity for the first time.

However, just as we held in *Crawn, supra*, that there remains a standard for liability even in contact recreational sports, albeit a heightened one, 136 *N.J.* at 503–04, 643 *A.*2d 600, there is also a limit to the protections that a private fitness center reasonably may exact from its patrons through the mechanism of an exculpatory agreement. Although it would be unreasonable to demand that a fitness center inspect each individual piece of equipment after every patron's use, it would be unreasonable, and contrary to the public interest, to condone willful blindness to problems that arise with the equipment provided for patrons' use.[15] Thus, had Powerhouse's management or employees been

---

[15] Indeed, even in those areas where the Legislature has imposed an assumption of risk by patrons of some recreational activities, certain common risks were

aware of a piece of defective exercise equipment and failed to remedy the condition or to warn adequately of the dangerous condition, or if it had dangerously or improperly maintained equipment, Powerhouse could not exculpate itself from such reckless or gross negligence. That showing was not made on this record.

As previously noted, the Appellate Division specifically found that the record was barren of evidence that Powerhouse had neglected over time to maintain its equipment. *Stelluti, supra,* 408 *N.J.Super.* at 460–61, 975 *A.2d* 494 (finding absence of any "chronic or repetitive patterns of inattention to the safety of the equipment"). There simply was no evidence in this record rising to such reckless or gross negligence in respect of Powerhouse's duty to inspect and maintain its equipment. Thus, we do not share the concern voiced by the dissent. Our decision cannot reasonably be read to signal that health clubs will be free to engage in "chronic or repetitive patterns of inattention to the safety of the[ir] equipment." *Ibid.* Nor do we share the dissent's view that today's holding gives a green light to permit widespread use of exculpatory agreements in restaurants, malls, and supermarkets. That extrapolation fails to account for our careful examination into the relevant nature of the type of activity that takes place in a private health club.

██ In sum, the standard we apply here places in fair and proper balance the respective public-policy interests in permitting parties to freely contract in this context (i.e. private fitness center

---

legislatively retained for operators of such facilities. *See N.J.S.A.* 5:13–1 to –11 (ski facilities); *N.J.S.A.* 5:14–1 to –7 (roller rinks); *N.J.S.A.* 5:15–1 to –12 (providers of equestrian activities). Importantly, among those risks were knowingly providing equipment that is faulty to the extent that it causes or contributes to injury; liability for injuries by a known dangerous latent condition on property for which warning signs have not been posted; and intentional injuries caused by the operator. Guided by the Legislature's own sense of operator risk that cannot be shirked, we regard such knowing and intentional acts of negligence as equivalent to the gross negligence that has been historically beyond the reach of exculpatory agreements.

memberships) and requires private gyms and fitness centers to adhere to a standard of conduct in respect of their business. Specifically, we hold such business owners to a standard of care congruent with the nature of their business, which is to make available the specialized equipment and facility to their invitees who are there to exercise, train, and to push their physical limits. That is, we impose a duty not to engage in reckless or gross negligence. We glean such prohibition as a fair sharing of risk in this setting, which is also consistent with the analogous assumption-of-risk approach used by the Legislature to allocate risks in other recreational settings with limited retained-liability imposed on operators.

## D.

In the instant matter, like the Appellate Division, we feel no obligation to reach and discuss the validity of other aspects of the agreement not squarely presented by the facts of Stelluti's case. Thus, we need not address the validity of the agreement's disclaimer of liability for injuries that occur on the club's sidewalks or parking lot that are common to any commercial enterprise that has business invitees. With respect to its agreement and its limitation of liability to the persons who use its facility and exercise equipment for the unique purpose of the business, we hold that it is not contrary to the public interest, or to a legal duty owed, to enforce Powerhouse's agreement limiting its liability for injuries sustained as a matter of negligence that result from a patron's voluntary use of equipment and participation in instructed activity. As a result, we find the exculpatory agreement between Powerhouse and Stelluti enforceable as to the injury Stelluti sustained when riding the spin bike.

## V.

For the foregoing reasons, we affirm the judgment of the Appellate Division that sustained the award of summary judgment to defendant.

Justice ALBIN, dissenting.

Today the Court has abandoned its traditional role as the steward of the common law. For the first time in its modern history, the Court upholds a contract of adhesion with an exculpatory clause that will allow a commercial, profit-making company to operate negligently—injuring, maiming, and perhaps killing one of its consumer-patrons—without consequence. Under the Court's ruling, a health club will have no obligation to maintain its equipment in a reasonably safe manner or to require its employees to act with due care toward its patrons. That is because, the Court says, a health club patron has the *right* to contract not only for unsafe conditions at a health club, but also for careless conduct by its employees. The Court's decision will ensure that these contracts of adhesion will become an industry-wide practice and that membership in health clubs will be conditioned on powerless consumers signing a waiver immunizing clubs from their own negligence. The Court's ruling undermines the common-law duty of care that every commercial operator owes to a person invited on to its premises.

Without the incentive to place safety over profits, the cost to the public will be an increase in the number of avoidable accidents in health clubs. And like the plaintiff in this case, the victims of the clubs' negligence will suffer the ultimate injustice—they will have no legal remedy.

Tens of thousands of New Jersey citizens join health clubs to stay healthy—to reduce the prospect of suffering from heart disease or a stroke, to battle obesity, and to improve the likelihood of living a longer life. The irony is that those who seek to live a better lifestyle through membership at a health club, now, will have a greater likelihood of having their well-being impaired through the careless acts of a club employee.

The ruling today is not in the public interest, not consistent with this Court's long-standing, progressive common-law jurisprudence protecting vulnerable consumers, and not in step with the enlightened approaches taken by courts of other jurisdictions that have

barred the very type of exculpatory clause to which this Court gives its imprimatur.

Because in upholding the exculpatory agreement the Court wrongly dismisses the case of plaintiff, Gina Stelluti, I respectfully dissent.

## I.

Ms. Stelluti's case was dismissed by the trial court on defendant's motion for summary judgment. Therefore, in reviewing the correctness of that decision, the facts must be viewed in the light most favorable to her. *Senna v. Florimont,* 196 *N.J.* 469, 475 n. 1, 958 *A.*2d 427 (2008); *see also R.* 4:46–2(c). Those facts present a cautionary tale.

On January 13, 2004, Gina Stelluti, then thirty-nine years old, joined the Powerhouse Gym (also referred to as Powerhouse Fitness and the Club) in Brick, New Jersey.[1] She arrived at the Club that day at 8:30 a.m., intending to participate in the 8:45 a.m. spin class. Before the spin class, with the assistance of a Powerhouse employee, Ms. Stelluti completed a "Membership Agreement" form, a "Member Information" form, a "Health/Safety Consent" form, and a "Powerhouse Fitness (The Club) Waiver & Release Form." As a condition of membership, she agreed to pay an enrollment fee and monthly fees. The waiver form signed by Ms. Stelluti released Powerhouse from liability for any injury she might suffer regardless of Powerhouse's fault. Powerhouse immunized itself from liability even if it caused serious bodily injury or death through the negligent maintenance of its equipment or the careless acts of its instructors and other employees. The waiver form was not explained to Ms. Stelluti. No one disputes that the contract was non-negotiable and offered on a take-it-or-leave-it basis, the very essence of a contract of adhesion.[2]

---

[1] Powerhouse Gym is the trade name for the health club operated by defendant Casapenn Enterprises, LLC.

[2] "[T]he essential nature of a contract of adhesion is that it is presented on a take-it-or-leave-it basis, commonly in a standardized printed form, without

Fifteen minutes after her arrival and completion of the paper-work, Ms. Stelluti was in the spin class. She informed the Powerhouse instructor that she had never taken a spin class before. The instructor told Ms. Stelluti to watch her during the class. The instructor strapped Ms. Stelluti's feet into the bicycle and adjusted the bicycle seat. The class began, and shortly afterwards the handlebars to Ms. Stelluti's bicycle came flying off, causing Ms. Stelluti to fall forward onto the floor while her feet were still strapped to the bike. Ms. Stelluti's physical-education expert concluded that the accident occurred because Powerhouse's instructor did not properly supervise or instruct Ms. Stelluti concerning the handlebars' "snap pin" adjustment to the spin bicycle. In short, this avoidable accident occurred because the instructor carelessly forgot to make certain that the bicycle's handlebars were secured.

As a result of her injuries, Ms. Stelluti suffered pain to her back, neck, and shoulders, and soreness in her thighs. She also sustained a cracked tooth. Ms. Stelluti, a waitress, had no health insurance and received treatment through charity-care facilities located at Community Medical Center in Toms River, Ocean Medical Center, and Jersey Shore University Medical Center. Three years after the accident, a board certified orthopedist offered his opinion that Ms. Stelluti suffered from "permanent chronic pain associated with myofascial pain syndrome."

Ms. Stelluti filed a lawsuit against Powerhouse, alleging that its negligence caused the accident. More specifically, she claims that Powerhouse failed to maintain the spin bicycle in a safe manner, to give her proper instructions in the use of the equipment, and to use due care in supervising her during the spin class.

---

opportunity for the 'adhering' party to negotiate except perhaps on a few particulars." *Rudbart v. N. Jersey Dist. Water Supply Comm'n and First Fid. Bank*, 127 *N.J.* 344, 353, 605 *A.2d* 681 (citations omitted), *cert. denied*, 506 *U.S.* 871, 113 *S.Ct.* 203, 121 *L.Ed.*2d 145 (1992).

The trial court upheld the exculpatory clause against Ms. Stelluti's claims and granted Powerhouse's motion for summary judgment. The Appellate Division affirmed, concluding that Powerhouse's contract of adhesion exculpated it from ordinary negligence. 408 *N.J.Super.* 435, 448, 459, 975 *A.*2d 494 (App.Div. 2009). The appellate panel held that "at least with respect to equipment being used at the club in the course of an exercise class or other athletic activity, the exculpatory agreement's disclaimer of liability for ordinary negligence is reasonable and not offensive to public policy." *Id.* at 459, 975 *A.*2d 494. The panel found that "[t]he fact that the class instructor may not have checked or tightened plaintiff's handlebars does not amount to anything worse than an unfortunate and perhaps careless omission" and that if "the pin was left in a non-secure position overnight by the club's maintenance or cleaning crew, that only would comprise an isolated act of simple negligence." *Id.* at 460, 975 *A.*2d 494.

I cannot conclude that the "careless omission"—the failure to properly instruct Ms. Stelluti or to maintain equipment in a safe condition—is beyond the protection of our common law, merely because Powerhouse compels a patron to sign an exculpatory clause. Powerhouse's "simple negligence" has had lasting, painful consequences for Ms. Stelluti, a first-time participant at the health club's spin class. Additionally, Ms. Stelluti did not have the burden of proving that Powerhouse committed multiple acts of negligence against an assortment of patrons. It should have been enough that Powerhouse committed an act of negligence against Ms. Stelluti. Typically, a plaintiff prosecuting a personal-injury lawsuit need show only that she suffered from an act of negligence; she is not required to establish that the act was part of a larger pattern of negligence. Negligence has been defined as

[the] failure to exercise, in the given circumstances, that degree of care for the safety of others, which a person of ordinary prudence would exercise under similar circumstances. It may be the doing of an act which the ordinary prudent person would not have done, or the failure to do that which the ordinary prudent person would have done, under the circumstances then existing.

[*Model Jury Charge (Civil)*, Negligence and Ordinary Care—General § 5.10A(1) (pre–1984).]

This Court must assume, for purposes of the summary judgment motion, that Powerhouse was negligent. Like the appellate panel, the Court concludes that Ms. Stelluti's signature on the waiver form exculpates Powerhouse from its own lack of due care. That legal conclusion flies in the face of the progressive development of the common law by this Court over the course of decades.

## II.

### A.

"Exculpatory agreements have long been disfavored in the law because they *encourage* a lack of care." *Hojnowski v. Vans Skate Park*, 187 *N.J.* 323, 333, 901 *A.*2d 381 (2006) (emphasis added) (citations omitted). "For that reason, courts closely scrutinize liability releases and invalidate them if they violate public policy." *Ibid.* (citation omitted); *see also Carvalho v. Toll Bros. & Developers*, 143 *N.J.* 565, 578, 675 *A.*2d 209 (1996) ("[C]ourts will not enforce an exculpatory clause if ... exoneration of the party would adversely affect the public interest." (citation and internal quotation marks omitted)); *Mayfair Fabrics v. Henley*, 48 *N.J.* 483, 487, 226 *A.*2d 602 (1967) ("[W]here there is unequal bargaining power, the public interest may call for rejection of an exculpatory clause exacted by the dominant party...."). Public policy is expressed not only in legislation, but also through the common law as developed by this Court. *See Vasquez v. Glassboro Serv. Ass'n, Inc.*, 83 *N.J.* 86, 98, 415 *A.*2d 1156 (1980).

A common-law duty—such as the duty to exercise reasonable care in maintaining commercial premises open to consumers—is "derive[d] from considerations of public policy and fairness." *Hopkins v. Fox & Lazo Realtors*, 132 *N.J.* 426, 439, 625 *A.*2d 1110 (1993) (citation omitted). Under our common law, business owners owe "a duty of reasonable or due care to provide a safe environment" to their patrons and "to discover and eliminate dangerous conditions" on their premises. *Nisivoccia v. Glass*

*Gardens, Inc.*, 175 *N.J.* 559, 563, 818 *A.*2d 314 (2003). Because business owners are in the best position to prevent the risk of harm to their customers, it is fair they should be responsible for injuries caused by their negligence. *See Hojnowski, supra*, 187 *N.J.* at 335, 901 *A.*2d 381. Unlike the customer, "[t]he operator of a commercial recreational enterprise can inspect the premises for unsafe conditions, train his or her employees with regard to the facility's proper operation, and regulate the types of activities permitted to occur." *Ibid.* The customer has no ability or right to control commercial premises, and therefore allowing a business owner to transfer the risk to the customer would undermine the very purpose of our premises-liability law. *See Dalury v. S–K–I, Ltd.*, 164 *Vt.* 329, 670 *A.*2d 795, 799 (1995).

"No contract can be sustained if it is inconsistent with the public interest or detrimental to the common good." *Vasquez, supra*, 83 *N.J.* at 98, 415 *A.*2d 1156 (citation omitted). That is true whether the contract violates a statutory or common-law duty. The common law is not an inferior kind of law, as is suggested by the Court's opinion today. The Legislature may enact a statute that alters or overrides the common law, but until such time the common law holds no lesser status than a statute when it commands that a duty be obeyed.

In the past, this Court has struck down exculpatory clauses that violated public policy, expressed either in the common law or a statute, particularly when there was inequality in bargaining power between the parties to the contract. *See, e.g., Hojnowski, supra*, 187 *N.J.* at 338, 901 *A.*2d 381 (holding that "a parent's execution of a pre-injury release of a minor's future tort claims arising out of the use of a commercial recreational facility is unenforceable"); *Carvalho, supra*, 143 *N.J.* at 569, 578–79, 675 *A.*2d 209 (striking down exculpatory agreements between construction site engineer, township, and developer that exonerated engineer from liability to injured construction worker); *McCarthy v. NASCAR, Inc.*, 48 *N.J.* 539, 540–43, 226 *A.*2d 713 (1967) (striking down exculpatory agreement between NASCAR and

racecar driver injured in accident as contrary to public policy expressed in statutory scheme); *Henningsen v. Bloomfield Motors, Inc.*, 32 *N.J.* 358, 364–67, 377, 403–04, 161 *A.2d* 69 (1960) (invalidating contractual provision exculpating manufacturer from liability for personal injury to purchaser of automobile). *Cf. Horelick v. Pa. R.R. Co.*, 13 *N.J.* 349, 357, 99 *A.2d* 652 (1953) (noting in common carrier case that "[f]or negligent failure to discharge such responsibility to its passengers, the [Railroad] would seemingly be accountable even if the tickets issued by it had contained express provision to the contrary"); *Blauvelt v. Citizens Trust Co.*, 3 *N.J.* 545, 554–55, 71 *A.2d* 184 (1950) (noting that New Jersey "courts have applied a strict construction to such exculpatory clauses . . . and have said that they do not relieve a trustee of liability where a loss results from negligence in the administration of the trust," but finding no negligence (internal citations omitted)).

On the other hand, this Court has recognized that sophisticated commercial entities, exercising equal bargaining power, are capable of protecting their own interests. *See, e.g., Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs.*, 182 *N.J.* 210, 230, 864 *A.2d* 387 (2005) ("Ordinarily, we are content to let experienced commercial parties fend for themselves and do not seek to 'introduce intolerable uncertainty into a carefully structured contractual relationship' by balancing equities." (citation omitted)). Thus, this Court has upheld an exculpatory clause in a contract between a commercial landlord and commercial tenant, who were not in unequal bargaining positions, and allowed them to distribute risk between themselves as they saw fit. *Mayfair Fabrics, supra*, 48 *N.J.* at 488–90, 226 *A.2d* 602.

### B.

Never before in the modern era has this Court upheld an exculpatory clause in which a commercial enterprise protects itself against its own negligence at the expense of a consumer, who had no bargaining power to alter the terms of the contract. The high

courts of other states have struck down exculpatory clauses similar to the type that our Court now validates. *See, e.g., Hanks v. Powder Ridge Rest. Corp.*, 276 *Conn.* 314, 885 *A.2d* 734, 741–42, 747–48 (2005) (finding that exculpatory agreement releasing recreational snowtube operator from prospective liability caused by operator's negligence violates public policy and therefore is unenforceable); *Dalury v. S–K–I, Ltd.*, 164 *Vt.* 329, 670 *A.2d* 795, 796 (1995) (invalidating contractual agreement exculpating ski operator from liability for its negligence in personal-injury claim brought by patron); *Hiett v. Lake Barcroft Cmty. Ass'n, Inc.*, 244 *Va.* 191, 418 *S.E.2d* 894, 895–96 (1992) (invalidating pre-injury release clause exculpating community association from its negligence in allegedly causing injury in swimming portion of athletic event).

Under Virginia's common law, contractual "provisions for release from liability for personal injury which may be caused by future acts of negligence are prohibited 'universally.'" *Hiett, supra*, 418 *S.E.2d* at 896–97 (citation omitted). Since 1890, Virginia's law has held that one party cannot "put the other parties to the contract at the mercy of its own misconduct" because "[p]ublic policy forbids it, and contracts against public policy are void." *Id.* at 896 (quoting *Johnson's Adm'x v. Richmond & Danville R.R. Co.*, 86 *Va.* 975, 11 *S.E.* 829, 829 (1890)). The 1890 Virginia Supreme Court found that exculpatory agreements are barred "where an enlightened system of jurisprudence prevails." *Johnson's Adm'x, supra*, 11 *S.E.* at 829.

The Vermont Supreme Court in *Dalury* held "that the exculpatory agreements which defendants require skiers to sign, releasing defendants from all liability resulting from negligence, are void as contrary to public policy." 670 *A.2d* at 796. Vermont's high court concluded that enforcing such an exculpatory agreement would undermine the state's premises-liability law. *Id.* at 799. It further explained:

> The policy rationale is to place responsibility for maintenance of the land on those who own or control it, with the ultimate goal of keeping accidents to the minimum level possible. Defendants, not recreational skiers, have the expertise and opportunity to foresee and control hazards, and to guard against the negligence of their

agents and employees. They alone can properly maintain and inspect their premises, and train their employees in risk management. They alone can insure against risks and effectively spread the cost of insurance among their thousands of customers. Skiers, on the other hand, are not in a position to discover and correct risks of harm, and they cannot insure against the ski area's negligence.
[*Ibid.*]

The Connecticut Supreme Court agreed with the reasoning of *Dalury* in striking down an exculpatory agreement immunizing a snowtube operator from its own negligence. *Hanks, supra,* 885 A.2d at 743–46. Connecticut's high court observed that "[t]he societal expectation that family oriented recreational activities will be reasonably safe is even more important where ... patrons are under the care and control of the recreational operator as a result of an economic transaction." *Id.* at 744. It also noted that "it is illogical to permit snowtubers, and the public generally, to bear the costs of risks that they have no ability or right to control." *Id.* at 745.

In New York, by statute, exculpatory agreements that exempt gymnasiums and other similar recreational facilities from liability for their negligence are "void as against public policy and wholly unenforceable." *N.Y. Gen. Oblig. Law* § 5–326 (2010).[3]

These cases, as well as the New York statute, show that the right to contract should be subordinate to the greater public interest.

### C.

Unlike health clubs, the allocation of risks between ski operators, roller skating rinks, equine establishments, and their custom-

---

[3] *N.Y. Gen. Oblig. Law* § 5–326 (2010) declares that exculpatory agreements between the owner or operator of any pool, gymnasium, place of amusement or recreation, or similar establishment and the user of such facilities, pursuant to which such owner or operator receives a fee or other compensation for the use of such facilities, which exempts the said owner or operator from liability for damages caused by or resulting from the negligence of the owner, operator or person in charge of such establishment, or their agents, servants or employees, shall be deemed to be void as against public policy and wholly unenforceable.

ers is governed by statute, not the common law. *See N.J.S.A.* 5:13–1 to –11 (ski statute); *N.J.S.A.* 5:14–1 to –7 (Roller Skating Rink Safety and Fair Liability Act); *N.J.S.A.* 5:15–1 to –12 (Equine Act). However, even in those statutes, the Legislature has not suggested that commercial operators in those fields can exempt themselves from liability through the use of exculpatory clauses.

Moreover, the Legislature has seen no need to give health clubs the power to immunize themselves from their own negligence. Indeed, as part of the Consumer Fraud Act, *N.J.S.A.* 56:8–1 to –181 (N.J.S.A. 56:8–1 to –195 as of December 1, 2010), the Legislature has given consumers statutory protection from unscrupulous health club service contracts. *N.J.S.A.* 56:8–39 to –48. Nowhere in that statutory scheme does the Legislature give approval to a health club to insert an exculpatory clause in a contract of adhesion—the ultimate device by which a commercial interest, through the use of superior bargaining power, forces consumers to accept terms contrary to their best interests.

It is hard to imagine how the public interest could be served by permitting health clubs to exempt themselves from the common law governing premises liability. Tens of thousands of people in this State go to health clubs to maintain healthy lifestyles and to improve their health. *See* Active Marketing Group, *2007 Health Club Industry Review* 5–6 (2007), *available at* http://active marketinggroup.com/AssetFactory.aspx?did=32 (estimating that as of 2005, New Jersey had more than 1000 health clubs, and that 16.6% of its population belonged to one); Miriam A. Cherry, *Exercising the Right to Public Accommodations: The Debate over Single–Sex Health Clubs,* 52 *Me. L.Rev.* 97, 103 (2000) (noting reasons why people attend health clubs). In 2006, the Legislature made a finding that "as many as 30 million people now visit health and exercise centers in this country." *N.J.S.A.* 2A:62A–30(d).

The benefits of exercise are beyond dispute. The Surgeon General has declared "that Americans can substantially improve their health and quality of life by including moderate amounts of physical activity in their daily lives." U.S. Dep't of Health and

Human Servs., *Physical Activity and Health: A Report of the Surgeon General* 3 (1996), *available at* http://www.cdc.gov/ncc dphp/sgr/pdf/sgrfull.pdf. Moreover, the United States Department of Health and Human Services has found that "[b]eing physically active is one of the most important steps that Americans of all ages can take to improve their health" and that "[r]egular physical activity reduces the risk of many adverse health outcomes." *2008 Physical Activity Guidelines for Americans,* at vi, *available at* http://www.health.gov/paguidelines/pdf/paguide.pdf. The health benefits of exercise include lower risks of early death, coronary heart disease, stroke, high blood pressure, obesity, adverse blood lipid profile, type 2 diabetes, metabolic syndrome, colon cancer, and breast cancer, to name a few. *Id.* at 9. Some health clubs even have rehabilitation/physical therapy programs for accident or stroke victims.

Whatever the Court says in its opinion, people will continue to go to health clubs, even if they are compelled to sign away their rights in a contract of adhesion. Most people do not have at their individual disposal the sophisticated exercise machinery and equipment, indoor tracks, pools, and trainers offered at health clubs. Gina Stelluti is a perfect example—a waitress without health insurance, who could not possibly afford to purchase the equipment available at a health club.

Ms. Stelluti does not claim that Powerhouse should be the general guarantor for every injury suffered in its facility. This case is not about a health club patron asserting that the facility is legally responsible for an injury caused by over-exertion, misuse of equipment, or from the act of another patron over whom the club has no control. Rather, Ms. Stelluti merely argues that a health club should be held responsible if it does not maintain its equipment in a reasonably safe manner and if its instructors do not exercise due care—matters over which a club does have control. It is one thing to assume a risk of which one is aware. It is another thing to say, as the Court does, that one should assume the risk for a dangerous condition of which one is unaware and

over which one has no control. That health club members should assume the risk, as suggested by the Court, for the club's failure to inspect and maintain its equipment in a reasonably safe condition runs completely contrary to the rationale underlying our common law governing premises liability.

### D.

Tort law is not just about compensating victims, but also about preventing accidents. By allowing a health club to eliminate its duty to exercise a reasonable degree of care, the majority has decreased the incentives for health clubs to provide a reasonably safe environment for their patrons. This will inevitably lead to more preventable accidents. Because health clubs will not have a legal incentive to maintain their equipment in a reasonably safe manner, how many cases will there be of handlebars flying off of spin bikes, of cables to weight machines breaking, of pools mistakenly treated with the wrong amounts or kinds of chemicals? Increasing profits is the dominant force motivating most commercial establishments; increasing public safety had been one of the objectives of tort law.

Powerhouse has not introduced any evidence that striking down the exculpatory clause will lead to an exorbitant financial expense or that increased insurance premiums cannot be minimally passed along to patrons. *Hojnowski, supra,* 187 *N.J.* at 335–36, 901 *A.*2d 381 (noting that commercial recreational operators can "spread the costs of insurance among its customers"). Our Court did not permit an automobile manufacturer—through an exculpatory clause in a contract—to immunize itself for personal injury caused by a defective car in *Henningsen, supra,* 32 *N.J.* at 365–67, 404, 161 *A.*2d 69, although building safer cars arguably might cost more. Encouraging safely built automobiles was in the public interest. Safer cars result in fewer serious injuries and deaths, and presumably fewer lawsuits. Similarly, invalidating exculpatory clauses that insulate health clubs from their own negligence will encourage health club owners to keep their premises reasonably

safe, which will result in fewer injuries and deaths, and fewer lawsuits.

There is a simple logic behind the law of premises liability: when business owners exercise due care, there are fewer accidents; when there are fewer accidents, there are fewer lawsuits; when there are fewer lawsuits, insurance premiums are more likely to go down rather than up. *See, e.g.,* David A. Hyman & Charles Silver, *The Poor State of Health Care Quality in the U.S.: Is Malpractice Liability Part of the Problem or Part of the Solution?,* 90 *Cornell L.Rev.* 893, 917–20 (2005) (detailing how tort liability and high insurance premiums led anesthesiologists to enact reforms, and "[a]s anesthesia became safer, lawsuits against anesthesiologists became less frequent and liability premiums for anesthesiologists declined significantly").

Not only is it unfair to saddle a blameless patron with the costs of the club's negligence, but we must recognize that the costs of *preventable* injuries are shouldered by society in many different ways, including through unemployment insurance, social services, and increased health-care costs. Ms. Stelluti—a victim without health insurance—is a case in point. Although her injuries were caused by the negligence of a commercial, profit-making entity, the State, which subsidizes charity care, will pick up a good part of the cost of her medical bills.

### E.

Finally, the Court relegates the common law to second-class status, allowing a contract of adhesion to eviscerate protections intended to safeguard the health and lives of consumers. In doing so, the Court has revived the discredited doctrine that the right to contract trumps the public interest—in this case, the public interest expressed in the common law. The Court's decision brings to mind the *Lochner* era of the early twentieth century when the United States Supreme Court struck down social-welfare legislation under the banner of the right to contract. *See, e.g., Lochner v. New York,* 198 *U.S.* 45, 57–58, 64, 25 *S.Ct.* 539, 543–44, 546, 49

*L.Ed.* 937, 941–42, 944–45 (1905) (striking down state law that regulated maximum number of hours bakers could work); *Adkins v. Children's Hosp. of D.C.*, 261 *U.S.* 525, 539, 545, 561–62, 43 *S.Ct.* 394, 395–97, 402–03, 67 *L.Ed.* 785, 789, 791, 798 (1923) (striking down legislation setting minimum wages for women and children in District of Columbia). In time, the Supreme Court rejected the *Lochner*-era right-to-contract philosophy that was used to invalidate legislation advancing the public welfare. *See Lincoln Fed. Labor Union v. Nw. Iron & Metal Co.*, 335 *U.S.* 525, 536–37, 69 *S.Ct.* 251, 257, 93 *L.Ed.* 212, 221 (1949).

The right to contract is not a blank check for commercial interests to impose conditions on consumers through exculpatory clauses that violate the public's health and safety. The adverse effects of today's decision may be far-reaching and long felt. Other commercial entities may see this case as a signal that exculpatory clauses, extracted through contracts of adhesion, may apply to their industries, trades, and professions. If health club owners can protect themselves from their own negligence, why wouldn't malls, supermarkets, and restaurants do the same?

### III.

The exculpatory clause to which the Court gives its blessing should be void as against public policy. That is so because the exculpatory clause in this case unfairly allocates the risk from the commercial operator, who is in the best position to remove and prevent the dangers on the premises, to the unwary patron, and because it encourages lack of due care. Exalting the right to contract—a contract of adhesion, no less—over the public interest is not in keeping with this Court's development of a progressive and enlightened common law.

I therefore respectfully dissent.

*For affirmance*—Chief Justice RABNER and Justices LaVECCHIA, WALLACE, RIVERA–SOTO and HOENS—5.

*For reversal*—Justices LONG and ALBIN—2.